# CALERO-TOLEDO ET AL. *v.* PEARSON YACHT LEASING CO.

No. 73–157. Argued January 7, 1974—Decided May 15, 1974

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and in Parts I and II of which STEWART, J., joined. WHITE, J., filed a concurring opinion, in which POWELL, J., joined, *post*, p. 691. STEWART, J., filed a separate statement, *post*, p. 690. DOUGLAS, J., filed an opinion dissenting in part, in which STEWART, J., joined in part, *post*, p. 691.

*Lynn R. Coleman* argued the cause for appellants. With him on the brief were *Francisco de Jesus-Schuck,* Attorney General of Puerto Rico, and *Miriam Naviera de Rodon,* Solicitor General.

*Gustavo A. Gelpi* argued the cause and filed a brief for appellee.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is whether the Constitution is violated by application to appellee, the lessor of a yacht, of Puerto Rican statutes providing for seizure and forfeiture of vessels used for unlawful purposes when (1) the yacht was seized without prior notice or hearing after allegedly being used by a lessee for an unlawful purpose, and (2) the appellee was neither involved in nor aware of the act of the lessee which resulted in the forfeiture.

---

*Solicitor General Bork, Assistant Attorney General Petersen, Deputy Solicitor General Frey, Gerald P. Norton, Jerome M. Feit,* and *Joseph S. Davies, Jr.,* filed a brief for the United States as *amicus curiae* urging reversal.

In March 1971, appellee, Pearson Yacht Leasing Co., leased a pleasure yacht to two Puerto Rican residents. Puerto Rican authorities discovered marihuana on board the yacht in early May 1972, and charged one of the lessees with violation of the Controlled Substances Act of Puerto Rico, P. R. Laws Ann., Tit. 24, § 2101 *et seq.* (Supp. 1973). On July 11, 1972, the Superintendent of Police seized the yacht pursuant to P. R. Laws Ann., Tit. 24, §§ 2512 (a)(4), (b) (Supp. 1973),[1] and Tit. 34, § 1722 (1971),[2] which provide that vessels used to

---

[1] Title 24, §§ 2512 (a)(4) and (b) provide:

"(a) The following shall be subject to forfeiture to the Commonwealth of Puerto Rico:

. . . . .

"(4) All conveyances, including aircraft, vehicles, mount or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in clauses (1) and (2) of this subsection;

. . . . .

"(b) Any property subject to forfeiture under clause (4) of subsection (a) of this section shall be seized by process issued pursuant to Act No. 39, of June 4, 1960, as amended, known as the Uniform Vehicle, Mount, Vessel and Plane Seizure Act, sections 1721 and 1722 of Title 34."

[2] Title 34, § 1722, provides:

"Whenever any vehicle, mount, or other vessel or plane is seized . . . such seizure shall be conducted as follows:

"(a) The proceedings shall be begun by the seizure of the property by the Secretary of Justice, the Secretary of the Treasury or the Police Superintendent, through their delegates, policemen or other peace officers. The officer under whose authority the action is taken shall serve notice on the owner of the property seized or the person in charge thereof or any person having any known right or interest therein, of the seizure and of the appraisal of the properties so seized, said notice to be served in an authentic manner, within ten (10) days following such seizure and such notice shall be understood to have been served upon the mailing thereof with return receipt requested. The owners, persons in charge, and

transport, or to facilitate the transportation of, controlled substances, including marihuana, are subject to seizure and forfeiture to the Commonwealth

other persons having a known interest in the property so seized may challenge the confiscation within the fifteen (15) days following the, service of the notice on them, through a complaint against the officer under whose authority the confiscation has been made, on whom notice shall be served, and which complaint shall be filed in the Part of the Superior Court corresponding to the place where the seizure was made and shall be heard without subjection to docket. All questions that may arise shall be decided and all other proceedings shall be conducted as in an ordinary civil action. Against the judgment entered no remedy shall lie other than a certiorari before the Supreme Court, limited to issues of law. The filing of such complaint within the period herein established shall be considered a jurisdictional prerequisite for the availing of the action herein authorized.

"(b) Every vehicle, mount, or any vessel or plane so seized shall be appraised as soon as taken possession of by the officer under whose authority the seizure took place, or by his delegate, with the exception of motor vehicles, which shall be placed under the custody of the Office of Transportation of the Commonwealth of Puerto Rico, which shall appraise same immediately upon receipt thereof.

"In the event of a judicial challenge of the seizure, the court shall, upon request of the plaintiff and after hearing the parties, determine the reasonableness of the appraisal as an incident of the challenge.

"Within ten (10) days after the filing of the challenge, the plaintiff shall have the right to give bond in favor of the Commonwealth of Puerto Rico before the pertinent court's clerk to the satisfaction of the court, for the amount of the assessed value of the seized property, which bond may be in legal tender, by certified check, hypothecary debentures, or by insurance companies. Upon the acceptance of the bond, the court shall direct that the property be returned to the owner thereof. In such case, the provisions of the following paragraphs (c), (d) and (e) shall not apply.

"When bond is accepted the subsequent substitution of the seized property in lieu of the bond shall not be permitted, said bond to answer for the seizure if the lawfulness of the latter is upheld, and the court shall provide in the resolution issued to that effect, for

of Puerto Rico. . The vessel was seized without prior notice to appellee or either lessee and without a prior adversary hearing. The lessees, who had registered the yacht with the Ports Authority of the Commonwealth, were thereafter given notice within 10 days of the

---

the summary forfeiture execution of said bond by the clerk of the court and for the covering of such bond into the general funds of the Government of Puerto Rico in case it may be in legal tender or by certified check; the hypothecary debentures or debentures of insurance companies shall be transmitted by the pertinent clerk of the court to the Secretary of Justice for execution.

"(c) After fifteen (15) days have elapsed since service of notice of the seizure without the person or persons with interest in the property seized have [sic] filed the corresponding challenge, or after twenty-five (25) days have elapsed since service of notice of the seizure without the court's having directed that the seized property be returned on account of the bond to that effect having been given, the officer under whose authority the seizure took place, the delegate thereof, or the Office of Transportation, as the case may be, may provide for the sale at auction of the seized property, or may set the same aside for official use of the Government of Puerto Rico. In case the seized property cannot be sold at auction or set aside for official use of the Government, the property may be destroyed by the officer in charge, setting forth in a minute which he shall draw up for the purpose, the description of the property, the reasons for its destruction and the date and place where it is destroyed, and he shall serve notice with a copy thereof on the Secretary of Justice.

"(d) In case the vehicle, mount, or vessel or plane is sold at auction, the proceeds from the sale shall be covered into the general fund of the Government of Puerto Rico, after deducting and reimbursing expenses incurred.

"(e) If the seizure is judicially challenged and the court declares same illegal, the Secretary of the Treasury of Puerto Rico shall, upon presentation of a certified copy of the final decision or judgment of the court, pay to the challenger the amount of the appraisal or the proceeds from the public auction sale of such property, whichever sum is the highest, plus interest thereon at the rate of 6% per annum, counting from the date of the seizure."

seizure, as required by § 1722 (a).[3] But when a challenge to the seizure was not made within 15 days after service of the notice, the yacht was forfeited for official use of the Government of Puerto Rico pursuant to § 1722 (c).[4] Appellee shortly thereafter first learned of the seizure and forfeiture when attempting to repossess the yacht from the lessees, because of their apparent failure to pay rent. It is conceded that appellee was "in no way . . . involved in the criminal enterprise carried on by [the] lessee" and "had no knowledge that its property was being used in connection with or in violation of [Puerto Rican Law]."

On November 6, 1972, appellee filed this suit, seeking a declaration that application of P. R. Laws Ann., Tit. 24, §§ 2512 (a)(4), (b), and Tit. 34, § 1722, had (1) unconstitutionally denied it due process of law insofar as the statutes authorized appellants, the Superintendent of Police and the Chief of the Office of Transportation of the Commonwealth, to seize the yacht without notice or a prior adversary hearing, and (2) unconstitutionally deprived appellee of its property without just compensation.[5] Injunctive relief was also sought.

---

[3] P. R. Laws Ann., Tit. 23, §§ 451 (e), 451b, and 451c, provide that no person shall "operate or give permission for the operation of" a vessel in Commonwealth waters without registering his interest in the vessel. Only the lessees had registered the yacht, and this led the District Court to conclude that "[f]rom the record in this case, we are not disposed to rule that the Commonwealth of Puerto Rico did not have reason to believe that [postseizure] notice to the owner was, in fact, given." 363 F. Supp. 1337, 1342 (PR 1973). Appellee does not contest this ruling.

[4] It is agreed that the yacht was appraised at a value of $19,800, and that the Chief of the Office of Transportation of the Commonwealth purports to maintain possession of the yacht as legal owner.

[5] Unconstitutionality of the statutes was alleged under both the Fifth and Fourteenth Amendments. The District Court deemed it unnecessary to determine which Amendment applied to Puerto Rico,

A three-judge District Court,[6] relying principally upon *Fuentes* v. *Shevin*, 407 U. S. 67 (1972), held that the failure of the statutes to provide for preseizure notice and hearing rendered them constitutionally defective. 363 F. Supp. 1337, 1342–1343 (PR 1973). Viewing *United States* v. *United States Coin & Currency*, 401 U. S. 715 (1971), as having effectively overruled our prior decisions that the property owner's innocence has no constitutional significance for purposes of forfeiture, the District Court further declared that the Puerto Rican statutes, insofar as applied to forfeit appellee's interest in the yacht, unconstitutionally deprived it of property without just compensation. 363 F. Supp., at 1341–1342. Appellants were accordingly enjoined from enforcing the statutes "insofar as they deny the owner or person in charge of property an opportunity for a hearing due to the lack of notice, before the seizure and forfeiture of its property and insofar as a penalty is imposed upon innocent parties." *Id.*, at 1343–1344. We noted probable jurisdiction. 414 U. S. 816 (1973). We reverse.

I

Although the parties consented to the convening of the three-judge court and hence do not challenge our juris-

---

see *Fornaris* v. *Ridge Tool Co.*, 400 U. S. 41, 43–44 (1970), and we agree. The Joint Resolution of Congress approving the Constitution of the Commonwealth of Puerto Rico, subjects its government to "the applicable provisions of the Constitution of the United States," 66 Stat. 327, and "there cannot exist under the American flag any governmental authority untrammeled by the requirements of due process of law as guaranteed by the Constitution of the United States." *Mora* v. *Mejias*, 206 F. 2d 377, 382 (CA1 1953) (Magruder, C. J.). See 48 U. S. C. § 737.

[6] Appellants initially opposed the convening of a three-judge court, arguing that the District Court should abstain. After a hearing, appellants withdrew their opposition and consented to the convening of a three-judge court.

diction to decide this direct appeal, we nevertheless may not entertain the appeal under 28 U. S. C. § 1253 [7] unless statutes of Puerto Rico are "State statute[s]" for purposes of the Three-Judge Court Act, 28 U. S. C. § 2281.[8] We therefore turn first to that question.

In *Stainback* v. *Mo Hock Ke Lok Po*, 336. U. S. 368 (1949), this Court held that enactments of the Territory of Hawaii were not "State statute[s]" for purposes of Judicial Code § 266, the predecessor to 28 U. S. C. § 2281, reasoning:

> "While, of course, great respect is to be paid to the enactments of a territorial legislature by all courts as it is to the adjudications of territorial courts, the predominant reason for the enactment of Judicial Code § 266 does not exist as respects territories. *This reason was a congressional purpose to avoid unnecessary interference with the laws of a sovereign state.* In our dual system of government, the position of the state as sovereign over matters not ruled by the Constitution requires a deference to state

---

[7] That section provides:

"Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding *required by any Act of Congress to be heard and determined by a district court of three judges.*" (Emphasis added.)

[8] That section provides:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any *State statute* by restraining the action of any officer of such State in the enforcement or exceution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title." (Emphasis added.)

legislative action beyond that required for the laws of a territory. A territory is subject to congressional regulation." 336 U. S., at 377–378 (footnotes omitted) (emphasis added).

Similar reasoning—that the purpose of insulating a sovereign State's laws from interference by a single judge would not be furthered by broadly interpreting the word "State"—led the Court of Appeals for the First Circuit some 55 years ago to hold § 266 inapplicable to the laws of the Territory of Puerto Rico. *Benedicto* v. *West India & Panama Tel. Co.*, 256 F. 417 (1919).

Congress, however, created the Commonwealth of Puerto Rico after *Benedicto* was decided. Following the Spanish-American War, Puerto Rico was ceded to this country in the Treaty of Paris, 30 Stat. 1754 (1898). A brief interlude of military control was followed by congressional enactment of a series of Organic Acts for the government of the island. Initially these enactments established a local governmental structure with high officials appointed by the President. These Acts also retained veto power in the President and Congress over local legislation. By 1950, however, pressures for greater autonomy led to congressional enactment of Pub. L. 600, 64 Stat. 319, which offered the people of Puerto Rico a compact whereby they might establish a government under their own constitution. Puerto Rico accepted the compact, and on July 3, 1952, Congress approved, with minor amendments, a constitution adopted by the Puerto Rican populace, 66 Stat. 327; see note accompanying 48 U. S. C. § 731d. Pursuant to that constitution the Commonwealth now "elects its Governor and legislature; appoints its judges, all cabinet officials, and lesser officials in the executive branch; sets its own educational policies; determines its own budget; and amends its own civil and criminal code." Leibowitz, The Applicability of Fed-

eral Law to the Commonwealth of Puerto Rico, 56 Geo.
L. J. 219, 221 (1967); see 28 Dept. of State Bull. 584–
589 (1953); *Americana of Puerto Rico, Inc.* v. *Kaplus,* 368
F. 2d 431 (CA3 1966); Magruder, The Commonwealth
Status of Puerto Rico, 15 U. Pitt. L. Rev. 1 (1953).

These significant changes in Puerto Rico's govern-
mental structure formed the backdrop to Judge Ma-
gruder's observations in *Mora* v. *Mejias,* 206 F. 2d 377
(CA1 1953):

> "[I]t may be that the Commonwealth of Puerto
> Rico—'El Estado Libre Asociado de Puerto Rico' in
> the Spanish version—organized as a body politic by
> the people of Puerto Rico under their own consti-
> tution, pursuant to the terms of the compact offered
> to them in Pub. L. 600, and by them accepted, is a
> State within the meaning of 28 U. S. C. § 2281.
> The preamble to this constitution refers to the Com-
> monwealth . . . which 'in the exercise of our natural
> rights, we [the people of Puerto Rico] now create
> within our union with the United States of America.'
> Puerto Rico has thus not become a State in the fed-
> eral Union like the 48 States, but it would seem to
> have become a State within a common and accepted
> meaning of the word. Cf. *State of Texas* v. *White,*
> 1868, 7 Wall. 700, 721. . . . It is a political entity
> created by the act and with the consent of the
> people of Puerto Rico and joined in union with the
> United States of America under the terms of the
> compact.
>
> "A serious argument could therefore be made that
> the Commonwealth of Puerto Rico is a State within
> the intendment and policy of 28 U. S. C. § 2281. . . .
> If the constitution of the Commonwealth of Puerto
> Rico is really a 'constitution'—as the Congress says
> it is, 66 Stat. 327,—and not just another Organic

Act approved and enacted by the Congress, then the question is whether the Commonwealth of Puerto Rico is to be deemed 'sovereign over matters not ruled by the Constitution' of the United States and thus a 'State' within the policy of 28 U. S. C. § 2281, which enactment, in prescribing a three-judge federal district court, expresses 'a deference to state legislative action beyond that required for the laws of a territory' [*Stainback* v. *Mo Hock Ke Lok Po*, 336 U. S., at 378] whose local affairs are subject to congressional regulation." 206 F. 2d, at 387–388 (footnote omitted).

Lower federal courts since 1953 have adopted this analysis and concluded that Puerto Rico is to be deemed "sovereign over matters not ruled by the Constitution" and thus a State within the policy of the Three-Judge Court Act. See *Mora* v. *Mejias,* 115 F. Supp. 610 (PR 1953); [9] *Marin* v. *University of Puerto Rico,* 346 F.

---

[9] The court in *Mora* quoted from the statement of the United States to the Secretary General of the United Nations explaining its decision to cease transmission of information concerning Puerto Rico under Art. 73 (e) of the United Nations Charter, which requires the communication of certain technical information by countries responsible for administering territories whose people have not yet attained a full measure of self-government, 115 F. Supp., at 612: " 'By the various actions taken by the Congress and the people of Puerto Rico, Congress has agreed that Puerto Rico shall have, under that Constitution, freedom from control or interference by the Congress in respect of internal government and administration, subject only to compliance with applicable provisions of the Federal Constitution, the Puerto Rican Federal Relations Act and the acts of Congress authorizing and approving the Constitution, as may be interpreted by Judicial decision. Those laws which directed or authorized interference with matters of local government by the Federal Government have been repealed.' "
28 Dept. of State Bull. 584, 587 (1953). But cf. Note; Puerto Rico; Colony or Commonwealth? 6 N. Y. U. J. Int'l L. & P. 115 (1973).

Supp. 470, 481 (PR 1972); *Suarez* v. *Administrador del Deporte Hipico de Puerto Rico,* 354 F. Supp. 320 (PR 1972). And in *Wackenhut Corp.* v. *Aponte,* 386 U. S. 268 (1967), we summarily affirmed the decision of a three-judge court for the District of Puerto Rico that had ordered abstention and said:

> "[A]pplication of the doctrine of abstention is particularly appropriate in a case . . . involv[ing] the construction and validity of a statute of the Commonwealth of Puerto Rico. For a due regard for the status of that Commonwealth under its compact with the Congress of the United States dictates, we believe, that it should have the primary opportunity through its courts to determine the intended scope of its own legislation and to pass upon the validity of that legislation under its own constitution as well as under the Constitution of the United States." 266 F. Supp. 401, 405 (1966).

Although the question of Puerto Rico's status under 28 U. S. C. § 2281 was raised in neither the Jurisdictional Statement nor the Motion to Affirm in *Wackenhut,* and we do not normally feel ourselves bound by a *sub silentio* exercise of jurisdiction, see *Hagans* v. *Lavine,* 415 U. S. 528, 533–535, n. 5 (1974); *United States* v. *More,* 3 Cranch 159, 172 (1805), this Court has noted that in three-judge court cases, "where . . . the responsibility [is] on the courts to see that the three-judge rule [is] followed," unexplained action may take on added significance. *Stainback* v. *Mo Hock Ke Lok Po,* 336 U. S., at 379–380. This is particularly so, when as in *Wackenhut,* the opinion supporting the judgment over which we exercised appellate jurisdiction had expressed the view that abstention was appropriate for reasons of comity, an oft-repeated justification for the abstention doctrine, see, *e. g., Railroad Comm'n of Texas* v. *Pullman Co.,* 312 U. S.

496, 500 (1941),[10] as well as the principal underpinning of the Three-Judge Court Act. See *Steffel* v. *Thompson*, 415 U. S. 452, 465–466 (1974).

While still of the view that § 2281 is not "a measure of broad social policy to be construed with great liberality," *Phillips* v. *United States*, 312 U. S. 246, 251 (1941), we believe that the established federal judicial practice of treating enactments of the Commonwealth of Puerto Rico as "State statute[s]" for purposes of the Three-Judge Court Act, serves, and does not expand, the purposes of § 2281. We therefore hold that a three-judge court was properly convened under that statute,[11] and that direct

---

[10] See also H. Friendly, Federal Jurisdiction: A General View 93 (1973).

[11] *Fornaris* v. *Ridge Tool Co.*, 400 U. S. 41 (1970), does not militate against this holding. There, we held that a Puerto Rican statute was not a "State statute" within 28 U. S. C. § 1254 (2), which permits appeals from judgments of federal courts of appeals holding *state* statutes unconstitutional. We noted that 28 U. S. C. § 1258, requiring that we permit final judgments of the Supreme Court of the Commonwealth of Puerto Rico to be reviewed by appeal or by certiorari, directly corresponded to the provisions of 28 U. S. C. § 1257 providing for review of final judgments of "state" courts. Since no parallel provision was added to § 1254 (2) to permit appeals from the courts of appeals holding Puerto Rican statutes unconstitutional, we said:

"Whether the omission was by accident or by design, our practice of strict construction of statutes authorizing appeals dictates that we not give an expansive interpretation to the word 'State.'" 400 U. S., at 42 n. 1.

This conclusion seems compelled by the history of the close relationship between 28 U. S. C. § 1254 (2) and 28 U. S. C. § 1257. In the Judiciary Act of 1789, 1 Stat. 73, 85–86, final decisions of state courts sustaining state statutes against challenges under the Federal Constitution were subjected to review by this Court on writ of error. See *King Mfg. Co.* v. *City Council of Augusta*, 277 U. S. 100 (1928). But prior to 1925, there was no appeal from "final" judgments of the federal circuit courts. See 36 Stat. 1157 (1911). When con-

appeal to this Court was proper under 28 U. S. C. § 1253. Accordingly, we now turn to the merits.

## II

Appellants challenge the District Court's holding that the appellee was denied due process of law by the omis-

---

sideration was being given to amendment of the Judiciary Act in 1924 and 1925

"[a]ttention was drawn to the disparity between the want of obligatory review over [decisions of the circuit courts involving the constitutionality of state statutes] and the existence of obligatory jurisdiction over a similar class of cases in the state courts. Senator Copeland rehearsed before the Senate correspondence he had had on this point with the Chief Justice, who had urged that if it was desirable to put the circuit courts of appeals on the same level with the state courts, it would be better to withdraw review as of right from the state courts and subject the decisions of both the state courts and the circuit courts solely to a discretionary review by the Supreme Court, rather than to allow obligatory review over all constitutional cases from both courts. The Chief Justice, however, justified the proposed discrimination on the ground that a circuit court of appeals in deciding a federal constitutional question 'would be more likely to preserve the Federal view of the issue than the State court, at least to an extent to justify making a review of its decision by our court conditional upon our approval.' However, an amendment prevailed which met this discrimination by allowing writ of error to the circuit courts of appeals in cases sustaining a constitutional claim against a state statute. The argument advanced by the Chief Justice thus became the basis for a new development of the principle which since 1789 had been the basis of Supreme Court review of the highest courts of the states. Due to the belief that the state courts would be more jealous of local rights than of federal claims, review had lain as of right where the constitutional claim was advanced and denied. Now, due to the belief . . . that the federal court would sustain constitutional claims as opposed to the local right, review was provided from the circuit courts of appeals where the constitutional claim was advanced and allowed. Thereby, the Senate 'intended to put the two on a perfect parity, allowing a writ of error from the circuit court of appeals under

sion from § 2512 (b), as it incorporates § 1722, of provisions for preseizure notice and hearing. They argue that seizure for purposes of forfeiture is one of those "'extraordinary situations' that justify postponing notice and opportunity for a hearing." *Fuentes* v. *Shevin*, 407 U. S., at 90; see *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337, 339 (1969); *Boddie* v. *Connecticut*, 401 U. S. 371, 378–379 (1971). We agree.[12]

---

conditions exactly the same, except reversed, and allowing a writ of certiorari in the one case as in the other case, so that the two would be entirely harmonious.'" F. Frankfurter & J. Landis, The Business of the Supreme Court 277–278 (1928) (footnotes omitted).

Thus, against that background, when Congress made § 1258 only a counterpart of § 1257, there could be no basis for an expansive reading of the word "State" in § 1254 (2), in the absence of its congressional amendment.

We have no occasion to address the question whether Puerto Rico is a "State" for purposes of 28 U. S. C. § 1343, a jurisdictional basis of appellee's complaint. Since the complaint and lease agreement, as incorporated, fairly read, leave little doubt that the matter in controversy exceeds $10,000 and arises under the Constitution of the United States, there is jurisdiction under 28 U. S. C. § 1331.

[12] Appellants also argue that the seizure did not result in any injury to appellee that constituted failure of preseizure notice and hearing a denial of due process. This is so, they contend, because the lease gave the lessees exclusive right to possession at the time of the seizure, and therefore appellee's nonpossessory interest was adequately protected by the statutory provisions for a post-seizure hearing. But the lease provides that lessees' failure, *inter alia*, within 15 days after notice from appellee to pay arrears of rent or use the yacht solely for legal purposes would establish a default entitling appellee to possession. Whether a default had in fact occurred between May 6, 1972, when a lessee was first accused of a narcotics violation, and the date of seizure, July 11, 1972, is not clear from the record, although it is clear that appellee did not attempt to repossess the yacht until October 19, 1972.

Since, however, our holding is that preseizure notice and hearing are not required by due process in the context of this forfeiture,

In holding that lack of preseizure notice and hearing denied due process, the District Court relied primarily upon our decision in *Fuentes* v. *Shevin, supra*. *Fuentes* involved the validity of Florida and Pennsylvania replevin statutes permitting creditors to seize goods allegedly wrongfully detained. A writ of replevin could be obtained under the Florida statute upon the creditor's bare assertion to a court clerk that he was entitled to the property, and under the Pennsylvania statute, upon filing an affidavit fixing the value of the property, without alleging legal entitlement to the property. *Fuentes* held that the statutory procedures deprived debtors of their property without due process by failing to provide for hearings " 'at a meaningful time.' " 407 U. S., at 80.

*Fuentes* reaffirmed, however, that, in limited circumstances, immediate seizure of a property interest, without an opportunity for prior hearing, is constitutionally permissible. Such circumstances are those in which

> "the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." *Id.*, at 91.

we have no occasion to remand for a determination (1) whether the company had an immediate, but as yet unexercised, right to possession on the date of seizure or merely a right to collect rents, together with a reversionary interest, and (2) whether either or both of these property interests would be of sufficient significance to require that the company be given an advance opportunity to contest the seizure. Cf. *Fuentes* v. *Shevin*, 407 U. S. 67, 86–87 (1972).

Thus, for example, due process is not denied when postponement of notice and hearing is necessary to protect the public from contaminated food, *North American Storage Co.* v. *Chicago,* 211 U. S. 306 (1908); from a bank failure, *Coffin Bros. & Co.* v. *Bennett,* 277 U. S. 29 (1928); or from misbranded drugs, *Ewing* v. *Mytinger & Casselberry, Inc.,* 339 U. S. 594 (1950); or to aid the collection of taxes, *Phillips* v. *Commissioner,* 283 U. S. 589 (1931); or the war effort, *United States* v. *Pfitsch,* 256 U. S. 547 (1921).

The considerations that justified postponement of notice and hearing in those cases are present here. First, seizure under the Puerto Rican statutes serves significant governmental purposes: Seizure permits Puerto Rico to assert *in rem* jurisdiction over the property in order to conduct forfeiture proceedings,[13] thereby fostering the public interest in preventing continued illicit use of the property and in enforcing criminal sanctions. Second, preseizure notice and hearing might frustrate the interests served by the statutes, since the property seized—as here, a yacht—will often be of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given. And finally, unlike the situation in *Fuentes,* seizure is not initiated by self-interested private parties; rather, Commonwealth officials determine whether seizure is appropriate under the provisions of the Puerto Rican statutes.[14] In these circumstances, we hold that this case

---

[13] Cf. *Ownbey* v. *Morgan,* 256 U. S. 94 (1921), cited with approval in *Fuentes* v. *Shevin, supra,* at 91 n. 23.

[14] *Fuentes* expressly distinguished seizure under a search warrant from seizure under a writ of replevin:

"First, a search warrant is generally issued to serve a highly important governmental need—*e. g.,* the apprehension and conviction of criminals—rather than the mere private advantage of a private party in an economic transaction. Second, a search warrant is

presents an "extraordinary" situation in which postpone-
ment of notice and hearing until after seizure did not
deny due process.[15]

## III

Appellants next argue that the District Court erred
in holding that the forfeiture statutes unconstitutionally
authorized the taking for government use of innocent
parties' property without just compensation. They urge
that a long line of prior decisions of this Court establish
the principle that statutory forfeiture schemes are not
rendered unconstitutional because of their applicability
to the property interests of innocents, and further that
*United States* v. *United States Coin & Currency,* 401
U. S. 715 (1971), did not—contrary to the opinion of
the District Court—overrule those prior precedents *sub
silentio.* We agree. The historical background of for-
feiture statutes in this country and this Court's prior
decisions sustaining their constitutionality lead to that
conclusion.

At common law the value of an inanimate object
directly or indirectly causing the accidental death of a

---

generally issued in situations demanding prompt action. The danger
is all too obvious that a criminal will destroy or hide evidence or
fruits of his crime if given any prior notice. Third, the Fourth
Amendment guarantees that the State will not issue search war-
rants merely upon the conclusory application of a private party.
It guarantees that the State will not abdicate control over the
issuance of warrants and that no warrant will be issued without a
prior showing of probable cause." 407 U. S., at 93–94, n. 30.

We have no occasion to address the question whether the Fourth
Amendment warrant or probable-cause requirements are applicable
to seizures under the Puerto Rican statutes.

[15] No challenge is made to the District Court's determination that
the form of postseizure notice satisfied due process requirements.
See n. 3, *supra.* Notice, of course, was required to be " 'reasonably
calculated' to apprise [the company] of the pendency of the forfeiture
proceedings." *Robinson* v. *Hanrahan,* 409 U. S. 38, 40 (1972).

King's subject was forfeited to the Crown as a deodand.[16] The origins of the deodand are traceable to Biblical [17] and pre-Judeo-Christian practices, which reflected the view that the instrument of death was accused and that religious expiation was required. See O. Holmes, The Common Law, c. 1 (1881). The value of the instrument was forfeited to the King, in the belief that the King would provide the money for Masses to be said for the good of the dead man's soul, or insure that the deodand was put to charitable uses. 1 W. Blackstone, Commentaries *300.[18] When application of the deodand to religious or eleemosynary purposes ceased, and the deodand became a source of Crown revenue, the institution was justified as a penalty for carelessness.[19]

---

[16] Deodand derives from the Latin *Deo dandum,* "to be given to God."

[17] See Exodus 21:28 ("[i]f an ox gore a man or a woman, and they die, he shall be stoned: and his flesh shall not be eaten").

[18] See 1 M. Hale, Pleas of the Crown 419, 423–424 (1st Am. ed. 1847); 2 F. Pollock & F. Maitland, History of English Law 473 (2d ed. 1909); Law of Deodands, 34 Law Mag. 188, 189 (1845); Finkelstein, The Goring Ox: Some Historical Perspectives on Deodands, Forfeitures, Wrongful Death and the Western Notion of Sovereignty, 46 Temp. L. Q. 169, 182 (1973).

[19] See Hale, n. 18, *supra,* at 424. Indeed, the abolition of the deodand institution in England in 1846, 9 & 10 Vict. c. 62, went hand in hand with the passage of Lord Campbell's Act creating a cause of action for wrongful death, 9 & 10 Vict. c. 93 (1846). Passage of the two bills was linked, because Lord Campbell was unwilling to eliminate the deodand institution, with its tendency to deter carelessness, particularly by railroads, unless a right of action was granted to the dead man's survivors. See 77 Hansard's Parliamentary Debates, Third Series 1031 (1845). See generally Finkelstein, n. 18, *supra,* at 170–171.

The adaptation of the deodand institution to serve the more contemporary function of deterrence is an example of a phenomenon discussed by Mr. Justice Holmes:

"The customs, beliefs, or needs of a primitive time establish a rule or a formula. In the course of centuries the custom, belief, or

Forfeiture also resulted at common law from conviction for felonies and treason. The convicted felon forfeited his chattels to the Crown and his lands escheated to his lord; the convicted traitor forfeited all of his property, real and personal, to the Crown. See 3 W. Holdsworth, History of English Law 68–71 (3d ed. 1927); 1 F. Pollock & F. Maitland, History of English Law 351 (2d ed. 1909). The basis for these forfeitures was that a breach of the criminal law was an offense to the King's peace, which was felt to justify denial of the right to own property. See 1 W. Blackstone, Commentaries *299.[20]

In addition, English Law provided for statutory forfeitures of offending objects used in violation of the customs and revenue laws—likely a product of the confluence and merger of the deodand tradition and the belief that the right to own property could be denied the wrongdoer. Statutory forfeitures were most often enforced under the *in rem* procedure utilized in the Court of Exchequer to forfeit the property of felons. See 3 W. Blackstone, Commentaries *261–262; *C. J. Hendry Co.* v. *Moore*, 318 U. S. 133, 137–138 (1943).

Deodands did not become part of the common-law tradition of this country. See *Parker-Harris Co.* v. *Tate* 135 Tenn. 509, 188 S. W. 54 (1916). Nor has forfeiture

---

necessity disappears, but the rule remains. The reason which gave rise to the rule has been forgotten, and ingenious minds set themselves to inquire how it is to be accounted for. Some ground of policy is thought of, which seems to explain it and to reconcile it with the present state of things; and then the rule adapts itself to the new reasons which have been found for it, and enters on a new career. The old form receives a new content, and in time even the form modifies itself to fit the meaning which it has received." The Common Law 5 (1881).

[20] In 1870, England eliminated most forfeitures of those convicted of felonies or treason. 33 & 34 Vict. c. 23.

of estates as a consequence of federal criminal conviction been permitted, see 18 U. S. C. § 3563; Rev. Stat. § 5326 (1874); 1 Stat. 117 (1790). Forfeiture of estates resulting from a conviction for treason has been constitutionally proscribed by Art. III, § 3, though forfeitures of estates for the lifetime of a traitor have been sanctioned, see *Wallach* v. *Van Riswick*, 92 U. S. 202 (1876). But "[l]ong before the adoption of the Constitution the common law courts in the Colonies—and later in the states during the period of Confederation—were exercising jurisdiction *in rem* in the enforcement of [English and local] forfeiture statutes," *C. J. Hendry Co.* v. *Moore, supra,* at 139, which provided for the forfeiture of commodities and vessels used in violations of customs and revenue laws. See *id.,* at 145–148; *Boyd* v. *United States,* 116 U. S. 616, 623 (1886). And almost immediately after adoption of the Constitution, ships and cargoes involved in customs offenses were made subject to forfeiture under federal law,[21] as were vessels used to deliver slaves to foreign countries,[22] and somewhat later those used to deliver slaves to this country.[23] The enactment of forfeiture statutes has not abated; contemporary federal and state forfeiture statutes reach virtually any type of property that might be used in the conduct of a criminal enterprise.

Despite this proliferation of forfeiture enactments, the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense. Thus, Mr. Justice Story observed in *The Palmyra,* 12 Wheat. 1 (1827), that a conviction for piracy was not a prerequi-

---

[21] Act of July 31, 1789, §§ 12, 36, 1 Stat. 39, 47; see also Act of Aug. 4, 1790, §§ 13, 22, 27, 28, 67, 1 Stat. 157, 161, 163, 176.

[22] Act of Mar. 22, 1794, 1 Stat. 347.

[23] Act of Mar. 2, 1807, 2 Stat. 426.

site to a proceeding to forfeit a ship allegedly engaged in piratical aggression in violation of a federal statute:

"It is well known, that at the common law, in many cases of felonies, the party forfeited his goods and chattels to the crown. The forfeiture did not, strictly speaking, attach *in rem;* but it was a part, or at least a consequence, of the judgment of conviction. . . . [T]he [Crown's right to the goods and chattels] attached only by the conviction of the offender. . . . But this doctrine never was applied to seizures and forfeitures, created by statute, *in rem,* cognizable on the revenue side of the Exchequer. The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing; and this, whether the offence be *malum prohibitum,* or *malum in se* . . . . [T]he practice has been, and so this Court understand the law to be, that the proceeding *in rem* stands independent of, and wholly unaffected by any criminal proceeding *in personam.*" *Id.,* at 14–15.

This rationale was relied upon to sustain the statutory forfeiture of a vessel found to have been engaged in piratical conduct where the innocence of the owner was "fully established." *United States* v. *Brig Malek Adhel,* 2 How. 210, 238 (1844). The vessel was "treated as the offender," without regard to the owner's conduct, "as the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party." *Id.,* at 233.[24]

---

[24] Thirty years earlier, the Court upheld a forfeiture of a quantity of coffee which had been transferred to bona fide purchasers after violation of the Non-Intercourse Act of 1809, upon reasoning that "[i]n the eternal struggle that exists between the avarice, enterprize and combinations of individuals on the one hand, and

*Dobbins's Distillery* v. *United States,* 96 U. S. 395 (1878), is an illustration of how severely this principle has been applied. That case involved a lessee's violations of the revenue laws which led to the seizure of real and personal property used in connection with a distillery. The lessor's assertions of innocence were rejected as a defense to a federal statutory forfeiture of his entire property, for the offense "attached primarily to the distillery, and the real and personal property used in connection with the same, without any regard whatsoever to the personal misconduct or responsibility of the owner, beyond what necessarily arises from the fact that he leased the property to the distiller, and suffered it to be occupied and used by the lessee as a distillery." *Id.,* at 401; see *United States* v. *Stowell,* 133 U. S. 1, 13–14 (1890).

Decisions reaching the same conclusion have continued into this century. In *Goldsmith-Grant Co.* v. *United States,* 254 U. S. 505 (1921), it was held that the federal tax-fraud forfeiture statute did not deprive an innocent owner of his property in violation of the Fifth Amendment. There, the claimant was a conditional vendor of a taxicab that had been used in the removal and concealment of distilled spirits upon which the federal tax was unpaid. Although recognizing that arguments against the application of the statute to cover an innocent owner were not without force, the Court rejected them, saying:

> "In breaches of revenue provisions some forms of property are facilities, and therefore it may be said, that Congress interposes the care and responsibility

the power charged with the administration of the laws on the other, severe laws are rendered necessary to enable the executive to carry into effect the measure of policy adopted by the legislature." *United States* v. *1960 Bags of Coffee,* 8 Cranch 398, 405 (1814).

of their owners in aid of the prohibitions of the law and its punitive provisions, by ascribing to the property a certain personality, a power of complicity and guilt in the wrong. In such case there is some analogy to the law of *deodand* by which a personal chattel that was the immediate cause of the death of any reasonable creature was forfeited. To the superstitious reason to which the rule was ascribed, Blackstone adds 'that such misfortunes are in part owing to the negligence of the owner, and therefore he is properly punished by such forfeiture.' . . .

"But whether the reason for [the forfeiture] be artificial or real, it is too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced." *Id.*, at 510–511.

See also *United States v. One Ford Coupe Automobile*, 272 U. S. 321 (1926) (Brandeis, J.); *General Motors Acceptance Corp. v. United States*, 286 U. S. 49 (1932) (Cardozo, J.). In *Van Oster v. Kansas*, 272 U. S. 465 (1926), the Court upheld, against a Fourteenth Amendment attack, a forfeiture under state law of an innocent owner's interest in an automobile that he had entrusted to an alleged wrongdoer. Judicial inquiry into the guilt or innocence of the owner could be dispensed with, the Court held, because state lawmakers, in the exercise of the police power, were free to determine that certain uses of property were undesirable and then establish "a secondary defense against a forbidden use . . . ." *Id.*, at 467.

Plainly, the Puerto Rican forfeiture statutes further the punitive and deterrent purposes that have been found sufficient to uphold, against constitutional challenge, the application of other forfeiture statutes to the property of innocents.[25] Forfeiture of conveyances that have been

---

[25] But for unimportant differences, P. R. Laws Ann., Tit. 24,

used—and may be used again—in violation of the narcotics laws fosters the purposes served by the underlying criminal statutes, both by preventing further illicit use of the conveyance and by imposing an economic penalty, thereby rendering illegal behavior unprofitable. See, e. g., H. R. Rep. No. 1054, 76th Cong., 1st Sess. (1939); S. Rep. No. 926, 76th Cong., 1st Sess. (1939); H. R. Rep. No. 2751, 81st Cong., 2d Sess. (1950); S. Rep. No. 1755, 81st Cong., 2d Sess. (1950).[26] To the extent that

---

§ 2512 (a) (Supp. 1973) is modeled after 21 U. S. C. § 881 (a). The latter section provides:

"(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

"(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) or (2), except that—

"(A) no conveyance used by any person as a common carrier in the transaction of business as a common carrier shall be forfeited under the provisions of this section unless it shall appear that the owner or other person in charge of such conveyance was a consenting party or privy to a violation of this subchapter or subchapter II of this chapter; and

"(B) no conveyance shall be forfeited under the provisions of this section by reason of any act or omission established by the owner thereof to have been committed or omitted by any person other than such owner while such conveyance was unlawfully in the possession of a person other than the owner in violation of the criminal laws of the United States, or of any State. . . ."

See n. 1, supra. The exceptions contained in subparagraphs (A) and (B) of the federal statute, although having no specific counterpart in § 2512 (a) (4), have been judicially recognized by the Supreme Court of Puerto Rico. See General Motors Acceptance Corp. v. Brañuela, 61 P. R. R. 701 (1943); Metro Taxicabs, Inc. v. Treasurer of Puerto Rico, 73 P. R. R. 164 (1952); Commonwealth v. Superior Court, 94 P. R. R. 687 (1967).

[26] Seizure and forfeiture statutes also help compensate the Government for its enforcement efforts and provide methods for obtaining

such forfeiture provisions are applied to lessors, bailors, or secured creditors who are innocent of any wrongdoing, confiscation may have the desirable effect of inducing them to exercise greater care in transferring possession of their property. Cf. *United States* v. *One Ford Coach,* 307 U. S. 219, 238–241 (1939) (DOUGLAS, J., dissenting).

Against the legitimate governmental interests served by the Puerto Rican statute and the long line of this Court's decisions which squarely collide with appellee's assertion of a constitutional violation, the District Court opposed our decision in *United States* v. *United States Coin & Currency,* 401 U. S. 715 (1971). This reliance was misplaced. In *Coin & Currency,* the Government claimed that the privilege against self-incrimination could not be asserted in a forfeiture proceeding under 26 U. S. C. § 7302 by one in possession of money seized from him when used in an illegal bookmaking operation. In the Government's view, the proceeding was not "criminal" because the forfeiture was authorized without regard to the guilt or innocence of the owner of the money. The Court's answer was that § 7302, read in conjunction with 19 U. S. C. § 1618, manifested a clear intention "to impose a penalty only upon those who [were] significantly involved in a criminal enterprise," 401 U. S., at 721–722, and in that circumstance the privilege could be asserted in the forfeiture proceeding by the person from whom the money was taken. Thus, *Coin & Currency* did not overrule prior decisions that sustained application to innocents of forfeiture statutes, like the Puerto Rican statutes, not limited in application to persons "significantly involved in a criminal enterprise."

This is not to say, however, that the "broad sweep"

---

security for subsequently imposed penalties and fines. See, *e. g., One Lot Emerald Cut Stones* v. *United States,* 409 U. S. 232, 237 (1972).

of forfeiture statutes remarked in *Coin & Currency* could not, in other circumstances, give rise to serious constitutional questions. Mr. Chief Justice Marshall intimated as much over a century and a half ago in observing that "a forfeiture can only be applied to those cases in which the means that are prescribed for the prevention of a forfeiture may be employed." *Peisch v. Ware,* 4 Cranch 347, 363 (1808).. It therefore has been implied that it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent. See, *id.,* at 364; *Goldsmith-Grant Co. v. United States,* 254 U. S., at 512; *United States v. One Ford Coupe Automobile,* 272 U. S., at 333; *Van Oster v. Kansas,* 272 U. S., at 467: Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; [27] for, in that circumstance, it

[27] The common law sought to mitigate the harshness of felony and deodand forfeitures. The writ of restitution was available to an individual whose goods were stolen by a thief and forfeited to the crown as a consequence of the thief's conviction. See 2 F. Pollock & F. Maitland, *supra,* n. 18, at 165–166; 3 W. Holdsworth, History of English Law 280 and n. 3 (3d ed. 1927). Mitigation with respect to deodands was less formalized:

"It seems also clear from the ancient authorities, that jurors always determined the amount of deodand to be imposed with great moderation, and with a due regard to the rights of property and the moral innocence of the party incurring the penalty. Our ancestors seem fully to have perceived the hardship of inflicting such penalty on one who had been guilty of no moral or indeed legal offence; and in all cases, therefore, where death was purely the result of accident, and not of negligence or carelessness, imposed a nominal fine, or found that only to be the deodand which by its immediate contact occasioned death." Law of Deodands, *supra,* n. 18, at 190.

Since 1790 the Federal Government has applied the ameliorative policy—first adopted in England, see *United States v. Morris,*

would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive. Cf. *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960).

But in this case appellee voluntarily entrusted the lessees with possession of the yacht, and no allegation has been made or proof offered that the company did all that it reasonably could to avoid having its property put to an unlawful use. Cf. *Goldblatt* v. *Town of Hempstead*, 369 U. S. 590, 596 (1962). The judgment of the District Court is

*Reversed.*

MR. JUSTICE STEWART joins Parts I and II of the Court's opinion, but, for the reasons stated in the dis-

_____

10 Wheat. 246, 293–295 (1825)—of providing administrative remissions and mitigations of statutory forfeitures in most cases where the violations are incurred "without willful negligence" or an intent to commit the offense. See 1 Stat. 122, c. 12 (1790); 1 Stat. 506 (1797); Rev. Stat. §§ 5292–5293 (1874); 19 U. S. C. § 1618; *The Laura*, 114 U. S. 411, 414–415 (1885); *United States* v. *United States Coin & Currency*, 401 U. S. 715, 721 (1971). Indeed, forfeitures incurred under 21 U. S. C. § 881 (a), which served as the model for enactment of the disputed Puerto Rican statute, see n. 25, *supra*, are subject to the remission and mitigation procedures of 19 U. S. C. § 1618. See 21 U. S. C. § 881 (d). Regulations implementing § 1618 provide that, if the seized property was in the possession of another who was responsible for the act which resulted in the seizure, the petitioner must produce evidence explaining the manner in which the other person acquired possession and showing that, prior to parting with the property, he did not know or have reasonable cause to believe that the property would be used in violation of the law or that the violator had a criminal record or a reputation for commercial crime. 19 CFR § 171.13 (a). These provisions are also extended to those individuals holding chattel mortgages or conditional sales contracts. 19 CFR § 171.13 (b). See also 18 U. S. C. § 3617 (b), establishing standards for judicial remission and mitigation of forfeitures resulting from violations of the internal revenue laws relating to liquor.

senting opinion of Mr. Justice Douglas, he would hold that the forfeiture of property belonging to an innocent and nonnegligent owner violates the Fifth and Fourteenth Amendments.

Mr. Justice White, with whom Mr. Justice Powell joins, concurring.

I join the Court's opinion, and agree that there was no constitutional necessity under *Fuentes* v. *Shevin*, 407 U. S. 67 (1972), or any other case in this Court to accord the owner-lessor of the yacht a hearing in the circumstances of this case. I add, however, that the presence of important public interests which permits dispensing with a preseizure hearing in the instant case, is only one of the situations in which no prior hearing is required. See *Mitchell* v. *W. T. Grant Co.*, ante, p. 600; *Arnett* v. *Kennedy*, ante, p. 134 (White, J., concurring).

Mr. Justice Douglas, dissenting in part.

While I agree that Puerto Rico is a State for purposes of the three-judge court jurisdiction, I dissent on the merits.

The discovery of marihuana on the yacht took place May 6, 1972. The seizure of the yacht took place on July 11, 1972—over two months later. In view of the long delay in making the seizure where is that "special need for very prompt action" which we emphasized in *Fuentes* v. *Shevin*, 407 U. S. 67, 91? The Court cites instances of exigent circumstances—seized poisoned food, dangerous drugs, failure of a bank, and the like. But they are inapt.

*Fuentes* v. *Shevin*, involved a contest between debtor and creditor and a resolution of private property rights not implicated in an important governmental purpose. Here important governmental purposes are involved. As

to that type of case we said in *Fuentes:* "First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated food." *Id.,* at 91–92.

Postponement of notice and hearing until after seizure of the vessel apparently was not needed here, as the District Court held. Yet after that two-month delay, forfeiture of the vessel is ordered without notice to the owner and without just compensation for the taking. On those premises this is the classic case of lack of procedural due process.

The owner on the record before us was wholly innocent of knowing that the lessee was using the vessel illegally. To analogize this case to the old cases of forfeiture of property of felons is peculiarly inappropriate. Nor is this a case where owner and lessee are "in cahoots" in a smuggling venture or negligent in any way. The law does provide for forfeitures of property even of the innocent. But as Mr. Chief Justice Marshall said in *Peisch* v. *Ware,* 4 Cranch 347, 365: "[T]he law is not understood to forfeit the property of owners or consignees, on account of the misconduct of mere strangers, over whom such owners or consignees could have no control."

The lessee of the vessel was, of course, no stranger.

Here unlike *United States* v. *One Ford Coach,* 307 U. S. 219, 238–239 (DOUGLAS, J., dissenting), there is no suggestion that the lessee was a mere strawman for runners of drugs. Even where such ambiguous circumstances were present the Court refused to impose forfeiture of an auto running illegal whiskey and belonging to those who acted "in good faith and without negligence." *Id.,* at 236.

The present case is one of extreme hardship. The District Court found that the owner "did not know that its property was being used for an illegal purpose and was completely innocent of the lessee's criminal act. After the seizure and within the time allowed by law, the Superintendent [of the Police] notified lessee. Plaintiff was never notified and, since lessee did not post bond, the yacht was forfeited to the Commonwealth of Puerto Rico. It was not until plaintiff attempted to recover possession of the yacht after lessee had defaulted in the rental payments that plaintiff learned of its forfeiture." 363 F. Supp. 1337, 1340. Moreover, the owner had included in the lease a prohibition against use of the yacht for an unlawful project.

If the yacht had been notoriously used in smuggling drugs, those who claim forfeiture might have equity on their side. But no such showing was made; and so far as we know only one marihuana cigarette was found on the yacht. We deal here with trivia where harsh judge-made law should be tempered with justice. I realize that the ancient law is founded on the fiction that the inanimate object itself is guilty of wrongdoing. *United States* v. *United States Coin & Currency,* 401 U. S. 715, 719–720. But that traditional forfeiture doctrine cannot at times be reconciled with the requirements of the Fifth Amendment. *Id.,* at 721. Such a case is the present one.

Some forfeiture statutes are mandatory, title vesting in the State when the forfeiting act occurs. *United States* v. *Stowell*, 133 U. S. 1, 19. Others are conditional, forfeiture occurring only if and when the State follows prescribed procedures. *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U. S. 693, 699. Some forfeiture statutes exclude from their scope, property used in violation of the law as to which the owner is not "a consenting party or privy." See 19 U. S. C. § 1594. Some provide for discretionary administrative or judicial relief from forfeiture if the forfeiture was incurred without willful negligence or without any intention on the part of the owner to violate the law, 19 U. S. C. § 1618, or if the owner had at no time any knowledge or reason to believe that the property was used in violation of specified laws, 18 U. S. C. § 3617 (b); *United States* v. *One Ford Coach*, 307 U. S. 219.

Puerto Rico, however, has no provision for mitigation in case the owner of the seized property is wholly innocent of any wrongdoing. And, as the Court says, these absolute, mandatory forfeiture procedures have been supported at least by much dicta in the cases.

But in my view, there was a taking of private property "for public use" under the Fifth Amendment, applied to the States by the Fourteenth, and compensation must be paid an innocent owner. Where the owner is in no way implicated in the illegal project, I see no way to avoid paying just compensation for property taken. I, therefore, would remand the case to the three-judge court for findings as to the innocence of the lessor of the yacht—whether the illegal use was of such magnitude or notoriety that the owner cannot be found faultless in remaining ignorant of its occurrence.

The law of deodands* was at one time as severe as the rule applied this day by the Court. See Law of Deodands, 34 Law Mag. 188–191 (1845). Its severity was tempered by juries who were sustained by the King's Bench, *id.*, at 191. The "great moderation" of the jurors in light of "the moral innocence of the party incurring the penalty," *id.*, at 190, is an example we should follow here. While the law of deodands does not obtain here (cf. *Goldsmith-Grant Co.* v. *United States*, 254 U. S. 505, 510–511; *United States* v. *One Ford Coupe*, 272 U. S. 321, 333), the quality of mercy is no stranger to our equity jurisdiction, *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329–330; *United States* v. *Wiltberger*, 5 Wheat. 76, 95.

---

*The law of deodands starting with Exodus 21:28 is related by O. Holmes, The Common Law 7 *et seq.* (1881). Deodand derives from *Deo dandum* (to be given to God). "It was to be given to God, that is to say to the church, for the king, to be expended for the good of his soul." *Id.*, at 24.