**UNITED STATES of America, Plaintiff,**

v.

**$53,661.50 IN U.S. CURRENCY, Defendant.**

**No. 84–1718–Civ–ARONOVITZ.**

United States District Court, S.D. Florida.

July 3, 1985.

Jack P. Attias, Key Biscayne, Fla., for claimant.

Barry S. Seltzer, Asst. U.S. Atty., Miami, Fla., for the U.S.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS CAUSE was tried to the Court non-jury and having heard the testimony of the witnesses, examined all of the exhibits admitted into evidence including the deposition of Officer Randy Heller, and having heard oral argument by counsel as well as conducting a review of post-trial submissions, this Court thereupon makes its Findings of Fact and Conclusions of Law based upon the aforegoing.

### FINDINGS OF FACT

1. This is a forfeiture action wherein the United States claims forfeiture of the defendant currency, $53,661.50 in U.S. Currency, pursuant to 31 U.S.C. § 5316. Yvonne Wirth claims ownership of the defendant currency and contests its forfei-

ture. This Court has jurisdiction herein pursuant to 28 U.S.C. §§ 1345 and 1355.

2. On February 15, 1984, Officer Randy Heller, Metro-Dade Police, stopped Edward Broff (son of Claimant) for a traffic violation on Perimeter Road adjacent to the Miami International Airport.

3. As Edward Broff exited the vehicle, Officer Heller observed a bulge protruding from Broff's right rear pants pocket. Officer Heller's investigation revealed that the bulge was a North American Arms Corp. .22 caliber long rifle (Derringer) containing five bullets. Heller placed Broff under arrest for carrying a concealed weapon and advised him of his *Miranda* rights.

4. Heller requested and secured the consent of Broff to search the vehicle.

5. Officer Heller discovered $53,661.50: $25,000 in a brown paper bag underneath the driver's seat; $27,900 in a green athletic bag in the trunk; and $761 in a men's purse on the front seat of the vehicle. Broff carried 50¢ in his pants pocket.

6. Broff told Heller and Fernandez that the defendant currency had recently been brought into the United States from Jamaica and that it was to be used to purchase aircraft parts.

7. At trial, Officer Heller testified that Edward Broff had stated at the scene of arrest that it was his (Edward Broff's) money and that he was going to use it to buy airplane parts. In his deposition taken on September 19, 1983, Officer Heller testified:

Q. What do you remember asking him and what do you remember him saying on the scene?

A. Basically I remember asking him what he was doing with that money, and he replied that he was going to purchase airplane parts with the money.

(*Deposition of Officer Randy Heller*, at p. 22)

Q. Did you ask him anything else, other than what he was going to do with the money? For instance, did you ask him where he got the money, whose money it was, why it was in the car in the form that it was, at the scene?

A. At the scene, no.

Q. At the scene, you didn't ask those questions. It was just briefly: What are you doing with the money?

A. Correct.

Q. So you had no knowledge of where it comes from, who owned it, except for him having possession of it.

A. Correct.

    .     .     .     .     .

Q. What else do you remember him saying about the money at the scene?

A. He said it was his money and that he was going to buy airplane parts with it.

(*Deposition of Officer Randy Heller*, at p. 23)

Officer Heller, in trial, also stated that in Station 3 to which Broff was taken from the scene of arrest, Broff stated he brought it all over from Jamaica fairly recently and all at one time.

7. *Deposition of Officer Randy Heller*, at p. 24:

    .     .     .     .     .

Q. Do you remember asking him at the scene where and/or how he got the money?

A. Not at the scene.

8. In his deposition, Officer Heller further testified:

Q. Did there come a time when you did have further discussion with Edward Broff concerning the origin of the money?

A. Yes.

Q. When was that?

A. That was at the station house, Station No. 3.

Q. And who was present at the time?

A. Myself, Mr. Broff and Sergeant Fernandez.

Q. What questions do you remember being asked, which either you asked or someone else asked, and what responses do you remember Edward Broff giving concerning the origin of the currency?

A. I remember the question of where did the money come from being asked, and he replied that he brought it over from Jamaica.

Q. What else do you remember being asked about the origin of the money, use of the money, anything about it?

A. I believe he also said it has something to do with his mother. I believe he said it was his mother's and it had something to do with an estate. That's all I can recall.

.    .    .    .    .

Q. What do you remember vaguely?

A. Again, just to reiterate, that I asked him where the money came from, he stated that he brought it from Jamaica, and I believe he said that it was his mother's money and it had something to do with an estate.

(*Deposition* at pp. 24, 25)

9. Special Agent United States Customs Michael Mulcahy interviewed Edward Broff at Station No. 3. He testified that at one time, Broff said the money had been brought in from Jamaica and further, that it was from his father's estate, belonged to his mother, and that his sister and he had contributed part of it as a gift to his mother; that some of it had consisted of advance hotel reservation payments to his mother, Yvonne Wirth, the claimant. Agent Mulcahy also testified that he had checked the computer which records Customs entry records into the United States to find any 4790 forms filed in the name of Edward Broff and had not found one approximating $54,000 in amount at any time. However, he had learned that Broff had filed two 4790 forms, one declaring $9,900 on arrival at Miami from Nassau through Chalks Airline on November 12, 1983 (Government's Exhibit 3), and another form at the Canadian border going from Canada into the United States in which he declared $5,100 (Government's Ex. 4). Mulcahy also testified that at Station No. 3, Broff told the agents that the currency was kept under a bed at a home owned by his mother in Ft. Lauderdale, Florida, which home she used from time to time and next door to which he lived when here.

10. *Subsequently,* on February 20, 1984, five days later, Broff was arrested by Jamaican police for failure to declare numerous items as he entered that country, and he had in his possession at that time, $54,000 in U.S. currency for which no outbound declaration had been filed. None of the aforegoing was known to Mulcahy or any other government agent at the time the money was seized on February 15, 1984.

11. Yvonne Wirth testified that her son had been entrusted with the proceeds from her husband's estate and collected monies from prepaid vacations. She introduced claimant's Exhibits 3, 4, and 5, showing that her daughter had received a cash distribution of $5,962, her son (Edward Wirth Broff) a similar sum of $5,962, and she herself had received a cash distribution of $31,925 from her husband's estate from the Probate Division, Circuit Court, Dade County, Florida. She testified, corroborated by Edward Broff, that the daughter and son had given their share of the father's estate to their mother, and that it was stored under the bed with other monies collected as prepaid vacation deposits on a hotel she owned and operated in Jamaica. Yvonne Wirth and Edward Broff both claimed that there was more than $60,000 in a bag under the bed in the house. There is no evidence to indicate that the money which was seized from Edward Broff's vehicle was not part of the money under the bed—(even though the under-the-bed story may stretch the imagination). The point is that they supported the existence of the money owned and claimed by Yvonne Wirth in an amount commensurate with that which was seized.

12. The testimony of Edward Broff and Yvonne Wirth did not specify exactly how much of the $60,000 had been brought in from Jamaica. Their uncontradicted testimony also was that approximately $43,000 was derived from the husband's/father's estate.

13. It appears from the testimony that Edward Broff had the authority of his

**184**

mother to utilize the money, to replace it, and this was solely within his discretion. For all intents and purposes, he had actual possession of the money but control was vested in his mother and he acted as her agent and utilized some of the money.

14. This is not an instance wherein the Court faults the credibility or any alleged lack of credibility of Officer Heller, Agent Mulcahy, or any other government witness. The sole and only finding relevant hereto is whether or not the officers representing Customs and the United States had probable cause (within its legal definition) to seize the money and seek its forfeiture. This Court could speculate and conjecture, as may the officers who were involved herein, that it was highly suspect that the money was kept under the bed in the house and that the story told by Broff seemed to be at times at odds with the individual explanations of particular sources of origin of the money, and it may well seem that suspicion could develop that Edward Broff is a money courier or perhaps otherwise involved in some illegal activities. However, it is not for this Court to indulge in such speculation or conjecture and the Court must act on the basis of evidence and proof sufficient to constitute probable cause at the time of the seizure.

15. It is this Court's view that, within the totality of all of the statements that Edward Broff made at Station No. 3 and at the scene of arrest, that the testimony given at trial by Officer Heller as to a single statement attributed to Broff that Broff had brought all the money over from Jamaica fairly recently and all at one time, together with the computer print-out information, were not sufficient to constitute a basis of seizure and forfeiture of the subject currency for failure to declare same. When considered within the totality of all the evidence, there was no probable cause.

### Conclusions of Law

■ 1. A forfeiture proceeding is an *in rem* action brought against a seized property pursuant to the fiction that the property itself is guilty of facilitating or committing a crime. *See Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–84, 94 S.Ct. 2080, 2090–92, 40 L.Ed.2d 452 (1974).

■ 2. In a forfeiture proceeding, as in the instant case, the plaintiff has the initial burden of demonstrating the existence of probable cause to seize the defendant currency. *United States v. One 1971 Chevrolet Corvette Automobile*, 496 F.2d 210, 212 (5th Cir.1974).

■ 3. Probable cause is defined as a reasonable ground for belief or guilt supported by less than *prima facie* proof but more than mere suspicion. *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980); *United States v. One 1975 Ford F–100 Pick-Up Truck*, 558 F.2d 755, 756 (5th Cir.1977); *United States v. One 1971 Corvette Automobile, supra.*

■ 4. Once a court determines that the plaintiff had probable cause to seize the defendant currency, the burden of proof shifts and forfeiture is proper unless a party with standing proves a defense by a preponderance of the evidence. *See United States v. One 1975 Ford F–100 Pickup Truck, supra.*

■ 5. To contest a forfeiture action, "an individual must first demonstrate an interest in the seized property sufficient to satisfy the Court of his standing as a claimant." *United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars ($364,960) in United States Currency*, 661 F.2d 319, 326 (5th Cir.1981). In general terms, ownership may be defined as a possessory interest in the seized property from which flows the right to exercise dominion and control. *United States v. One 1945 Douglas C–54 (DC–4) Aircraft*, 604 F.2d 27, 28 (8th Cir.1979).

■ 6. It is the conclusion of this Court that in the first instance, government agents did not have probable cause but only mere suspicion and therefore, they

had no appropriate grounds upon which to seize the money.

7. Yvonne Wirth, the claimant, has established standing to contest the forfeiture and has proven her right to claim the money even though it was in the actual possession of her son at the time of seizure. It was there with her permission and she had constructive possession. Although Edward Broff Wirth was in actual possession of the said currency on the date of the seizure, February 15, 1984, he was the authorized agent for claimant and had permission to have in his possession said currency for his and the family's use. Plaintiff has established mere suspicion for the seizure of the defendant currency but has failed to establish probable cause for granting the Forfeiture in Rem Complaint.

8. This Court therefore does not have to reach a determination on the third prong of law involved here as to whether the claimant has demonstrated a defense to the seizure by a preponderance of the evidence. Admittedly, it would be difficult to give full credibility to the testimony of Edward Broff and in rendering this verdict, the Court has granted only a limited recognition of his credibility, but in doing so, the Court in no way impugns the credibility of any of the government's witnesses. This conclusion is simply based on a lack of probable cause at the time of the seizure and further, that the claimant has established standing.

9. A Final Judgment will be entered herein directing that the United States' request for forfeiture of the subject currency be DENIED and claimant's claim to the subject currency in the sum of $54,661.50 in United States currency is hereby RECOGNIZED. The plaintiff is

ORDERED and DIRECTED FORTHWITH to return said sum of money to the claimant and Final Judgment shall be entered herein directing same accordingly, together with costs of the Court to be assessed against the plaintiff.