**JUICI–RICH PRODUCTS, INC., Plaintiff,**

v.

**Richard D. LOWE, Individually and a Regional Supervisor of the Illinois Department of Public Health, Defendant.**

No. 87–3275.

United States District Court, C.D. Illinois, Springfield Division.

April 23, 1990.

R. Bruce Patterson, Springfield, Ill., for plaintiff.

Lance T. Jones, Asst. Atty. Gen., Springfield, Ill., for defendant.

## OPINION

RICHARD MILLS, District Judge:

A question of possible contamination of fruit juice for school children.

Can a Civil Rights action lay?

Not under these facts.

Juici–Rich Products, Inc., has brought this suit—under the aegis of 42 U.S.C. § 1983—seeking to recover for injuries stemming from an alleged violation of its constitutional rights by Illinois Public Health official Lowe. Juici–Rich complains that Lowe's actions, taken in the course of his employment as a supervisor for the Illinois Department of Public Health (IDPH), violated its rights to due process and equal protection of the law, as those rights are extended by the Fourteenth Amendment.

Lowe has now moved for summary judgment on the grounds that (1) no equal protection or due process violation can be established by the facts of this case, and that even if such violations occurred (2) he was entitled to qualified immunity for his actions. Also, Lowe argues (3) that to the extent the complaint seeks recovery from him in his capacity as the Regional Supervisor of the Illinois Department of Public Health, the Eleventh Amendment bars this action.

Because we agree with Defendant Lowe as to each of these assertions, we enter summary judgment in his favor.

## FACTS

This lawsuit had its genesis on May 28, 1987, when a large number of school children in Danville, Illinois, succumbed to a food-related illness. Juici–Rich's products were among those served at the school, and so Juici–Rich, like others of the school's suppliers, was inspected by officials of the IDPH to ascertain whether its products contained any contaminants related to the Danville illnesses. Significantly, fruit punch and orange juice taken from the school were found to contain a high content of yeast and mold growth.

On June 3, 1987, IDPH employee Elizabeth Watkins obtained from Juici–Rich a product sample for testing. Two days later, on June 5, Watkins and IDPH employee Robin Amsbary, as well as Donald Voeller of the federal Food and Drug Administration, inspected the Juici–Rich facility (by consent); the results from the laboratory testing were not yet available. During the inspection, the health officials noted numerous unsanitary conditions and violations of health laws. Among other things, the inspectors noted mold growing on the floors, walls, ceiling and shelving in the facility, and they also noted mold growth on the equipment used to produce and package Juici–Rich's products. The inspectors took note of other unsanitary condi-

tions as well, such as standing water, bulging wall panels, cracked and pitted floor surfaces, and the like. Significant plumbing violations were also observed, as were various practices and procedures which were not in conformance with public health law.

Following that inspection, the IDPH inspectors left with Juici–Rich a copy of their inspection report, including detailed recommendations to correct unsanitary conditions. These recommendations required corrective actions anywhere from one to sixty days following the inspection; the only three matters requiring 24 hour correction were that Juici–Rich was to begin using an appropriate amount of chlorine for sanitizing, was to label and identify raw products on the body of containers rather than merely upon lids, and was to require all employees to wear hair and beard restraints during production. The inspectors then left the facility.

On June 8, the two IDPH inspectors (Amsbary and Watkins), along with the FDA investigator Voeller, met with the Defendant Lowe in his office to discuss the Juici–Rich facility. The inspectors showed Lowe their inspection report, and provided him with a verbal briefing on the situation, and additionally informed him that they were in agreement, as were IDPH employees Dr. Flentge and Dr. Francis, that the products of the facility should be embargoed. They brought this to Lowe's attention, though, because in the end the decision whether to embargo was his.

Based upon this information and the recommendations made by the others, Lowe was moved to consider the possibility of an embargo. Consequently, he and the two IDPH inspectors and the FDA investigator returned to the Juici–Rich plant. The FDA investigator had called ahead, so the plant owner (Mr. Keller) was expecting them, and met them outside the plant. Keller refused them entry, and tape recorded (with consent) their conversation. In essence, that conversation consisted of Lowe explaining to Keller that he was there as a follow-up to the previous inspection. He explained that if Keller would permit entry,

he would make his own inspection, and if he found the condition of the premises to not warrant immediate action, none would be taken; on the other hand, should the conditions warrant immediate action, Lowe would present to Keller an agreement to destroy the contaminated product then in the facility, and if Keller would refuse to sign the agreement Lowe alternatively would place an embargo on the product, which would forbid anyone to move or consume the product pending further proceedings. Keller, however, refused entry to the premises, and so Lowe explained that his only remaining alternative was to embargo the facility's products based upon the knowledge he then possessed. After a fairly lengthy (and fairly heated) discussion, Lowe did issue an embargo covering "[a]ll food products which have been opened, mixed, and/or packaged within the facility ... as well as the food products located in the Juici–Rich, Inc. tractor-trailer located on the facility grounds."

The day following the embargo, lab results were returned from the June 3 sample collection, and these reflected an extremely high yeast and mold count. On June 18, 1987, the Attorney General filed an action in state court seeking to condemn the food product embargoed on June 8. That condemnation action is still pending in the state court.

## COMPLAINT AND MOTION

Juici–Rich's asking price is $4,000,000 for compensation for claimed violations of its constitutional rights flowing from Lowe's actions on June 8.

Juici–Rich contends that when Lowe showed up to embargo the product, he did not provide Juici–Rich with laboratory reports identifying its products as contaminated. Moreover, Juici–Rich claims that Lowe had no authority to embargo its products because he lacked any reason, probable cause, or reasonable suspicion that those products were adulterated or contaminated. In fact, Juici–Rich contends that Lowe had already decided that he would embargo the product when he appeared at the facility on June 8, inasmuch as he in-

formed Keller that he had three options then: to embargo the product without inspecting the facility, or, after inspecting the facility, to embargo the product or to destroy the product with Juici–Rich's consent. Finally, Juici–Rich alleges that at the time of the June 5 inspection, the IDPH had already cleared Juici–Rich of any responsibility for the Danville food-borne illness outbreak.

Juici–Rich puts all this together, and argues that it adds up to a deprivation of its property without due process of law in violation of § 1983 and of the Fourteenth Amendment to the United States Constitution, as well as in violation of Article I, Section 2 of the Illinois Constitution; the Plaintiff also argues that these actions deprived it of equal protection of the laws in violation of the same statutory and constitutional provisions. Plaintiff also states that no administrative remedy exists to compensate it for these injuries.

Lowe has filed a motion arguing that no genuine issue of any material fact exists with respect to the matters raised in Juici–Rich's complaint. Lowe argues that his actions fully conformed with Illinois statutory authority, and that under the circumstances Juici–Rich was provided with all process it was due. Lowe further contends that in any event his actions are not subject to § 1983 sanctions because he is entitled to qualified immunity, since his conduct did not violate any clearly established statutory or constitutional rights of which a reasonable person would have known. Finally, Juici–Rich has sued Lowe in both his individual and his official capacities, and Lowe notes that the Eleventh Amendment to the United States Constitution bars this suit to the extent it seeks recovery against him in his official capacity.

Juici–Rich has responded to this motion by stressing its position that Lowe lacked any probable cause to believe that its products were contaminated or adulterated. Moreover, it argues that clear statutory and constitutional authority existed, of which Lowe should have known, which established that an embargo under those circumstances was unwarranted; through this, Juici–Rich attempts to deflect Lowe's qualified immunity argument. Finally, Juici–Rich addresses Lowe's Eleventh Amendment argument by noting that this case was removed from state court, and that this therefore is Lowe's forum of choice, and that he should thus not be allowed to raise his Eleventh Amendment argument.

## SUMMARY JUDGMENT STANDARD

■ Under Fed.R.Civ.P. 56(c), summary judgment should be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Nevertheless, the rule is also well established that the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Thus, the "preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed." *Id.* at 251, 106 S.Ct. at 2511 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Applying this standard, the Court now turns to the case at bar.

## DISCUSSION

■ We begin by addressing the three easiest matters. First, Juici–Rich has not attempted to defend its complaint's contention that its right to equal protection of the law was violated by Lowe's actions. We think this wise, because it is clear that

Juici–Rich is not a member of any protected class with respect to this action, and it is also clear that the legislation upon which Lowe purports to have acted is rationally related to a legitimate state interest; indeed, we can say with assurance that the facts of this case, as presented in the parties' memoranda and exhibits, decidedly support Lowe's rational basis for taking the actions which he took. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303–06, 96 S.Ct. 2513, 2516–18, 49 L.Ed.2d 511 (1976). No genuine issue of any material fact therefore exists with respect to the equal protection allegation of Juici–Rich's complaint, and so summary judgment is entered as to it.

█ Secondly, as for Lowe's arguments pertaining to the Eleventh Amendment, it is abundantly clear that that amendment bars suit against Lowe in his official capacity. Juici–Rich's response to this argument (that this case was removed and therefore is in the forum of Lowe's choosing) is simply irrelevant; the Eleventh Amendment would bar suit against Lowe in his official capacity whether suit was pending in this Court or a state court. *Will v. Michigan Department of State Police,* —— U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *see also Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Summary judgment shall be entered, therefore, with respect to this complaint to the extent it seeks recovery against Lowe in his official capacity.

Our third preliminary matter requires that we foretell the conclusion of the following discussion: we hold against Juici–Rich on all federal issues raised by this suit. That will leave only Juici–Rich's Illinois constitutional claims extant, but we choose not to exercise our pendant jurisdiction over these non-federal claims. They will therefore be dismissed. *See Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 611–12 (7th Cir.1986).

█ We are now ready to tackle Lowe's argument that no deprivation of Juici–Rich's property without due process of law occurred here, and also his argument that he is entitled to qualified immunity under

these facts. The bottom line: We hold that no genuine issue of material fact exists with respect to these issues, and that Lowe is entitled to summary judgment on these grounds as well.

### The Relevant Statutory Scheme

We first must explicate the statutory scheme under which Lowe was acting in June of 1987. The Illinois Food, Drug and Cosmetic Act, Ill.Rev.Stat. ch. 56½, ¶¶ 501–526 (1985), provides the IDPH with a number of powers and responsibilities with respect to food, drugs, cosmetics, or medical or other types of devices. The Act is wide-ranging in its scope, covering such matters as the labeling of food, drugs or cosmetics, and the permissible additive or adulteration levels of those, and is largely patterned after the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–392.

For our purposes, the most important provision of the Illinois Food, Drug and Cosmetic Act is § 6(a), Ill.Rev.Stat. ch. 56½, ¶ 506(a), which provides that

> [w]hen an authorized agent of the Director finds or has probable cause to believe that any food ... is adulterated ... within the meaning of this Act, he shall affix to such article a tag or other appropriate marking giving notice that the article is or is suspected of being adulterated ... and has been detained or embargoed and warning all persons not to remove or dispose of such article by sale or otherwise until permission for removal or disposal is given by such agent or the court. It is unlawful for any person to remove or dispose of such detained or embargoed article by sale or otherwise without such permission.

Section 10 of the Act, Ill.Rev.Stat. ch. 56½, ¶ 510, provides that

> A food is adulterated—(a)(1) if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health.

After an authorized agent of the IDPH determines that probable cause exists to believe that a food is adulterated, § 6(b) of the Act, Ill.Rev.Stat. ch. 56½, ¶ 506(b), provides that he shall petition the court for condemnation of the food; however, if he should discover that the food is not in fact adulterated, he is required to remove the tag which marks the food as adulterated.

The ball then falls into the court's lap to determine whether the embargoed food actually is adulterated; if the court so finds, § 6(c) of the Act, Ill.Rev.Stat. ch. 56½, ¶ 506(c), requires that the food be destroyed at the expense of the person from whom it was confiscated.

The above, in essence, constitute the statutory provisions at work here. To place those in the current context, Lowe received the reports of the IDPH inspectors, along with their recommendations, and from these determined that he had probable cause to believe that Juici–Rich's products were adulterated—in the statute's words, he claims to have determined that the products contained deleterious substances in such quantities that they may ordinarily have rendered the products injurious to health. Upon making this probable cause determination, Lowe tagged the Juici–Rich facility with an embargo notice, which forbade anyone from removing the embargoed products prior to a court determination regarding condemnation. Lowe then went to the attorney general, who petitioned the circuit court of Sangamon County, Illinois, for a libel of condemnation of the products. It is now up to that court to determine whether the food actually is adulterated, and we assume the parties to this action are vigorously arguing in that court the merits of the condemnation action. Because the court has not yet determined that the food is adulterated, it apparently has not yet been destroyed.

### The Merits

At the outset, it is important to make clear what this case is *not* about. Juici–Rich does not seem to argue that the entire statutory scheme under which Lowe operated violated its constitutional rights, *i.e.,* that the scheme is wholly arbitrary and thus deprived it of its substantive rights under the due process clause, *see Zinermon v. Burch,* ——— U.S. ———, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990), or included insufficient post-deprivation remedies; in the event it is arguing that, it is clearly mistaken. The seizure of food thought to be contaminated is constitutionally permissible without preseizure notice and hearing. Such a seizure is

> directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Fuentes v. Shevin,* 407 U.S. 67, 91, 92 S.Ct. 1983, 2000, 32 L.Ed.2d 556 (1972). As the Court acknowledged in *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 679, 94 S.Ct. 2080, 2089, 40 L.Ed.2d 452 (1974), "due process is not denied when postponement of notice and hearing is necessary to protect the public from contaminated food," (citing *North American Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908)). Juici–Rich can therefore raise no credible claim that Illinois may not seize what it reasonably believes to be adulterated food for the protection of the public, and provide the food's owner a hearing only after the seizure. That process, in fact, is going on right now, and Juici–Rich may be able to convince the state court that its products were not adulterated when embargoed by Lowe. But that process is all that is constitutionally required here.

The issue facing this Court is much narrower: Our concern is solely with the actions of Lowe on June 8, and specifically whether he had, at the time he issued the embargo, any "probable cause to believe that [the] food ... [was] adulterated ... within the meaning of [the] Act." If he had no such probable cause, then the embargo may have constituted a violation of

Juici–Rich's right to due process of law (whether or not the food actually was adulterated), because the procedures set forth in the Act were not followed. Conversely, if he had such probable cause, no constitutional violation exists here. Of course, we are only concerned with whether any genuine issue of material fact exists as to this issue.

Juici–Rich has raised two arguments to support its contention that Lowe lacked probable cause. (1) First, it argues that Lowe did not have any probable cause, whether or not the food was adulterated; this issue focuses upon what Lowe knew and when, even assuming that the factors he relied on would establish that the food was adulterated. (2) Second, Juici–Rich argues that whatever probable cause Lowe may have had, it was not any probable cause to believe that the food was adulterated; this issue focuses upon the factors cited by Lowe as warranting the embargo, and specifically the mold growth, the fecal strep and the E-coli bacteria.

### (1) Probable Cause

■ Juici–Rich makes two arguments with respect to whether Lowe had probable cause. First, it argues that when the plant was inspected on June 5, 1987, IDPH already knew that Juici–Rich was not implicated in the Danville food poisoning outbreak. Instead, Juici–Rich hints that some improper motive drove the IDPH inspectors to scrutinize Juici–Rich's operation.

This argument fails on several grounds. First, the facts as presented by the parties clearly indicate that IDPH personnel did not know on June 5 that Juici–Rich had been cleared of any involvement in the Danville outbreak, contrary to Juici–Rich's assertions to the contrary. In fact, Juici–Rich's sole authority for this assertion is a feeling and belief attested to by Keller (Juici–Rich's owner) in his affidavit. This is not enough to raise a genuine issue of fact on this matter, in the face of clear testimony by several IDPH authorities that at the time of the June 5 inspection, Juici–Rich was still suspected of causing the Danville outbreak.

Moreover, this argument fails because even if the June 5 inspection was not in response to the Danville outbreak, IDPH has full and complete authority to make such inspections. Although Juici–Rich alludes to some improper motive for the inspection, it has not substantiated those in the least. Rather, the June 5 inspection was an appropriate and proper administrative inspection, whether or not it was prompted by the Danville outbreak.

Finally, and most importantly, this is a nonissue because the June 5 inspection was not made by Lowe himself, but rather by other IDPH staffers. Lowe, in fact, claims to have known nothing about the Juici–Rich situation until June 8, when those staffers briefed him on the situation. We have thrown out this suit as it pertains to Lowe in his official capacity, and Lowe was not involved in the inspection in his individual capacity. Nor has Juici–Rich sued the IDPH inspectors, and so this argument is irrelevant as to the liability of the only party-Defendant to this suit, Lowe.

Juici–Rich's second contention with respect to this first issue is more troublesome; Juici–Rich contends that Lowe already knew that he would embargo Juici–Rich's product when he arrived at the facility on June 8. Juici–Rich contends that this shows that Lowe was operating out of some improper motive, rather than from a genuine finding of probable cause that the food was adulterated.

Juici–Rich's argument here stems from the tape recorded conversation between Lowe and his inspectors and Keller just prior to the placing of the embargo on June 8. In that conversation, Lowe told Keller that he (Lowe) had at that time three options: to embargo the products without benefit of an inspection, or to inspect the premises again and then embargo, or then destroy the products with Keller's consent. Our own view of this conversation was that Lowe, although speaking as though he had already decided that an embargo was proper, nevertheless retained an open mind such that he would have not embargoed the product if his inspection did not substantiate the reports he had already heard. This

view is borne out by Lowe's deposition, where he asserted that had he been allowed to inspect, and had that inspection revealed no significant health hazards, he would not have embargoed the product. Moreover, he had already been refused entry to inspect at the time the statements were made. Under these circumstances, the Court would conclude that the transcribed statements from the tape recorded conversation do not imply any improper motive on Lowe's part.

We also recognize, though, that the conversation itself is ambiguous, and could support an inference that the embargo was placed not because of the existence of probable cause within the Act's meaning, but rather from some other motive. A genuine issue of fact therefore exists as to this point, but that alone will not stand in the way of summary judgment, because the fact in question is not material to this case.

Even if the conversation demonstrates that Lowe had already determined to embargo the product prior to his arrival at Juici–Rich, the reports previously presented to Lowe by the inspectors were sufficient to establish probable cause to believe that the food inside Juici–Rich's facility was adulterated. Lowe had read the inspectors' detailed summary of the inspection, and had discussed the inspection with them to some length. Moreover, other IDPH professionals had stated their views that an embargo was warranted. These facts easily support Lowe's contention that he had probable cause to believe the products were adulterated, and he would have been justified in issuing the embargo without ever attempting to verify the inspection. That he did attempt to personally verify the information given to him by others does not make his decision any the less reasonable, and certainly that alone would not support a contention that his actions were unconstitutional.

We note parenthetically that Juici–Rich has also raised the related contention that Lowe had no laboratory reports confirming that the products were adulterated on June 8, and that this somehow establishes the lack of probable cause. But as Lowe points out, laboratory reports are not a prerequisite to an embargo; instead, all that is needed is probable cause to believe the products were contaminated. Indeed, if confirmatory laboratory reports were required prior to any embargo, the public health concerns promoted by the probable cause embargo would be largely unmet by the Act. This attack therefore must fail, too.

So much, then, for Juici–Rich's argument that Lowe lacked probable cause; the information provided to him prior to his issuance of the embargo fully supported that decision, because it provided probable cause to believe that the food had been tainted.

### (2) Adulteration

The final issue, however, is whether those matters pointed to by the inspectors could constitute any adulteration of the foods within the meaning of the Act. In support of its contention that the mold growth and other matters relied upon by Lowe to establish probable cause of adulteration were not, in fact, adulteration, Juici–Rich asks us to recognize the *de minimis* rule recognized in the Federal Food, Drug and Cosmetic Act, by virtue of which courts have refused to enforce condemnation actions under that Act where only minimal amounts of adulteration are found. The Federal Act would allow condemnation even for the most minor amounts of adulteration, but the court-created *de minimis* rule allows small quantities to be overlooked, especially where no Defect Action Level (a tolerance level established by the FDA) is established for the contaminant. Juici–Rich appears to argue that whatever mold or other contaminants may have been present, such was not enough to warrant the embargo, and points out that no Direct Action Level has been set for mold, so that an embargo on the basis of mold growth is improper.

This argument has two flaws. First, the Illinois Act, in contrast to the Federal Act, does make allowance for minor amounts of contamination. Section 8 of the Act, Ill. Rev.Stat. ch. 56½, ¶ 508, provides that

[n]othing in this Act shall be construed as requiring the Director to report for the institution of proceedings under this Act, minor violations of this Act, when the Director believes that the public interest will be adequately served in the circumstances by a suitable written notice or warning.

Moreover, § 10(a)(1) of the Act, Ill.Rev. Stat. ch. 56½, ¶ 510(a)(1), which applies here, provides that a food is not adulterated if the non-added deleterious substance is not present in quantities sufficient to ordinarily render it injurious to health. We therefore have no need to adopt any court-created *de minimis* rule here, because the ground is adequately covered by the statute itself.

The other problem with this argument is that it relies on cases discussing whether seized goods should be condemned and destroyed, rather than whether an initial seizure is appropriate. Obviously the burden is greater under a condemnation action than under a mere seizure, or the considerations of *Calero–Toledo* and *North American Storage Co.* would have no meaning. Lowe did not need to *prove* that the food was adulterated at the time he placed the embargo on Juici–Rich's products; he will undoubtedly be required to prove to the state court that the food is adulterated in order to win his condemnation suit there, but as for his decision to embargo all he needed was *probable cause* to believe that the goods were adulterated.

■ At its best, Juici–Rich's argument here is that since no Defect Action Level exists for mold growth or the other stated contaminants in its products (fecal strep and E-coli), Lowe could not have had probable cause to believe that these could be present in such an amount as to ordinarily render the products injurious to health. Juici–Rich has not, however, contradicted Lowe's testimony that mold growth is presumed to be excessive if the mold is visible to the naked eye, nor has Juici–Rich provided any contradictory testimony to establish that a reasonable person in Lowe's position would not have had probable cause to believe that such large amounts of mold could

be injurious to the public health within the meaning of the Act. The reports upon authority of which Lowe acted revealed that mold growth was prevalent throughout the Juici–Rich facility, and even was present on the manufacturing and packaging machinery. Lowe has stated that these reports gave him probable cause to believe the products produced by Juici–Rich were adulterated, and Juici–Rich has not come forward with any evidence to the contrary. This argument therefore does not avail Juici–Rich.

### Qualified Immunity

■ Even if we are mistaken as to the existence of any genuine issue of material fact with respect to the substance of Juici–Rich's claims, it is clear that Lowe's actions in no way violated clearly established statutory or constitutional rights of which a reasonable person would have known, and therefore Lowe is entitled to qualified immunity for his actions. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1981). So long as Lowe had probable cause to believe the food was adulterated, he did not violate any clearly established constitutional rights issuing the embargo notice. Moreover, Juici–Rich has failed to show any clearly established statutory or constitutional reason why Lowe would not have had such probable cause in these circumstances.

The state court may well decide that the food was not, in fact, adulterated, but that is irrelevant for our purposes. At the time he made the decision to embargo, no clear constitutional or statutory authority existed (or at least Juici–Rich has failed to show us any) which would clearly show Lowe's actions as being unconstitutional or illegal. Hence, even if substantively Lowe may have breached Juici–Rich's constitutional rights, he is entitled to qualified immunity for those actions.

*Ergo,* Defendant's motion for summary judgment is ALLOWED with respect to Plaintiff's federal constitutional claims; judgment is ENTERED hereby in Defendant's favor on these. Plaintiff's state con-

stitutional claims are DISMISSED WITH-OUT PREJUDICE for want of jurisdiction.

Case CLOSED.