PROPERTY CLERK OF NEW YORK CITY POLICE DEPARTMENT, Petitioner, v MICHAEL MOLOMO, Respondent.

FORD MOTOR CREDIT COMPANY, Respondent, v MICHAEL MOLOMO, Defendant, and ANDREW FURLONG, as New York City Police Department Property Clerk, Appellant.

First Department, April 23, 1992

APPEARANCES OF COUNSEL

*Byron L. Friedman* of counsel *(Wilson, Elser, Moskowitz, Edelman & Dicker,* attorneys), for respondent.

*Elizabeth S. Natrella* of counsel *(Pamela Seider Dolgow* with her on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for appellant.

## OPINION OF THE COURT

KUPFERMAN, J.

On the afternoon of August 16, 1989, defendant Michael Molomo and a female passenger in his 1988 Mercury Topaz were arrested in the Bronx and charged with criminal possession of narcotics and the vehicle was seized as an instrumentality of crime.

We are all agreed that Molomo, the purchaser of the motor vehicle, by using it while making a drug purchase, turned it into an instrumentality of crime within the meaning of section 14-140 (b) of the Administrative Code of the City of New York, which provides for the vehicle's forfeiture.

The only issue is the right of the lienholder of the vehicle, Ford Motor Credit Company, to replevin of the vehicle to satisfy its perfected security interest.

Ford purchased the retail installment contract covering the vehicle in question from Bronx-Lincoln Mercury, the selling dealership.

The cash price for the vehicle was $12,824.93 plus finance charges, insurance, extended warranty, interest, etc., making the total amount financed $20,847. Less the owner's payments, which were current at the time of the seizure, there is an outstanding balance due Ford of $17,719.95.

According to Ford, at the time of the seizure the value of the automobile was some $6,850.

The trial court held that Ford, as the innocent holder of a security interest, having provided in the purchase agreement that the illegal use of the vehicle would constitute a breach of contract, had done all that could be expected to prevent illegal use of the property and was thus entitled to replevin and the immediate return of the seized vehicle. To ensure that the owner not get the vehicle back, the court, in accordance with Administrative Code § 14-140 (e), enjoined Ford from returning the vehicle to him or allowing him to redeem it, or reinstating his retail installment contract.

The Property Clerk plans to sell the vehicle at auction and retain 10% of the proceeds for its administrative expenses and remit the remainder to Ford. Ford, like any lienholder, can bid at the sale, but prefers to take back the automobile and make its own arrangements for its disposition in the hope of mitigating its loss. Thus, to the extent that, no matter how you look at it, the proceeds from the sale will be insufficient to satisfy Ford's lien, we are really engaged in an intellectual exercise. In any event, the owner from whom the vehicle was seized is liable for any deficiency.

Nevertheless, I am unable to see how this case can be distinguished from our decision in *City of New York v Salamon* (161 AD2d 470, 471), which unanimously held that although the same party, Ford Motor Credit Company, had done all it reasonably could to prevent the illegal use of the vehicle in question and was innocent of any wrongdoing, that did not entitle it to immediate possession of the vehicle, "but rather merely entitled it to satisfy its lien from the proceeds of the property after the forfeiture had been adjudicated against the guilty party. *(Calero-Toledo v Pearson Yacht Leasing Co.,* 416 US 663; *Santora Equip. Corp. v City of New York,* 138 Misc 2d 631; *Matter of Dillon v Reese,* 93 Misc 2d 464.)"

The dissent's attempt to distinguish *Salamon (supra)* on the premise that in this instance Ford has never received satisfaction on its lien and that in *Salamon* we were primarily concerned with the question of notice is unpersuasive. There is simply nothing in our decision in *Salamon* to indicate that the question of whether or not Ford received satisfaction on its lien would have had any bearing on our holding that Ford was merely entitled to satisfy its lien from the proceeds of the property after the forfeiture had been adjudicated against the guilty party rather than to immediate possession of the vehicle.

Moreover, the reliance of the trial court and the dissent on the dicta in *Calero-Toledo v Pearson Yacht Leasing Co. (supra,* at 688-690) is misplaced. Although the majority (per Brennan, J.) indicated that "it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent * * * [or] an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property" *(supra,* at 689), it nevertheless upheld the forfeiture despite the fact that the owner of

the yacht in question, as did Ford in this case, "had included in the lease a prohibition against use of the yacht for an unlawful project." *(Supra,* at 693 [Douglas, J., dissenting].)

As noted in *Calero-Toledo (supra),* forfeiture is not a new phenomenon. The origins of the common-law remedy whereby the value of an inanimate object which directly or indirectly caused the accidental death of a King's subject was forfeited to the Crown as a deodand ("derives from the Latin *Deo dandum,* 'to be given to God' " *[supra,* at 681, n 16]) are traceable to the Bible ("See Exodus 21:28" *[supra,* at 681, n 17) and earlier practices, which reflected the view that the instrument of death was the accused and that religious expiation was required. Although deodands did not become part of the common-law tradition of this country, in rem as opposed to in person forfeiture statutes have proliferated to the extent that "contemporary federal and state forfeiture statutes reach virtually any type of property that might be used in the conduct of a criminal enterprise" and "the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense." *(Supra,* at 683.)

"Because the property itself is the defendant in an *in rem* action, its illegal use is the material consideration; the guilt or innocence of the property owner is thus irrelevant" (2A Weinstein-Korn-Miller, NY Civ Prac ¶ 1311.02).

Nor, should Ford's status as a lienholder, not an owner, be glossed over. As such, it certainly doesn't have any greater right to possession of the vehicle than the owner, who, by his criminal acts, forfeited such right. CPLR article 13-A, effective August 1, 1984, is New York's comprehensive forfeiture statute, which, while in personam in nature, nevertheless provides in CPLR 1349 (2) (a) for the sale of forfeited property and specifies that the proceeds of such sale be paid in satisfaction of any lien or claim against property forfeited. While CPLR 1311 (4) provides for dismissal of a forfeiture action in the interests of justice, such provision is unique and nothing in the article suggests that it applies in the limited forfeiture proceeding available pursuant to Administrative Code § 14-140. In fact, the owner of the property has no right to such property since Administrative Code § 14-140 (e) (1) provides that he or she cannot be deemed a lawful claimant. *(Matter of Property Clerk of N. Y. City Police Dept. v Ferris,* 77 NY2d 428, 431.)

To adopt the trial court's reasoning would be to defeat the

purpose of section 14-140 and to create two distinct classes of owners subject to forfeiture: those who own the property seized outright and are thus subject to complete forfeiture, as was the case in *Calero-Toledo (supra),* and those who are mere lessees or owners of property subject to a mortgage or other lien, in which case the full value of the property would not be forfeited but merely the owner's equity. Knowledgeable criminals already use leased premises or personalty as instrumentalities of crime, thus avoiding the risks of outright ownership.

Whatever other steps a lienor might take to protect its interests from loss, e.g., the retail installment contract herein required the buyer to insure the vehicle and gave him the option of credit life and credit disability insurance, Ford could conceivably insure itself for any loss it might sustain in the event the buyer violated a law thus triggering the seizure and forfeiture provisions of the Administrative Code. *(See, e.g., Goelet v National Sur. Co.,* 249 NY 287, where a restaurant was padlocked for one year for violation of the Volstead [National Prohibition] Act and the landlord recovered under surety bonds provided by the tenant since there was no point in attempting to recover from the insolvent tenant.)

Finally, harsh as a forfeiture may seem,the risks inherent in Ford's position as a secured creditor are no greater in this instance, where the value of its lien is diminished by the unlawful conduct of its debtor, than they would be in the event its debtor violated the retail installment contract by failing to obtain the required insurance and the vehicle was stolen or destroyed. Moreover, in practical terms, the only real difference in effect in the present matter is the 10% administrative fee.

Accordingly, the judgment appealed from should be modified, on the law, to the extent of vacating the second and third decretal paragraphs which directed that the motor vehicle forfeited be delivered to Ford or, failing such delivery, that the Property Clerk pay Ford $6,850 plus interest from the date of seizure and disbursements and enjoined Ford from delivering the vehicle to defendant or allowing him to redeem it or reinstate his contract with it. As so modified, the judgment should otherwise be affirmed, without costs.

WALLACH, J. (dissenting). Ford Motor Credit Company (Ford) leased a motor vehicle to Molomo under a standard installment payment contract. Molomo was arrested in August 1989 while using the motor vehicle to make a drug purchase, and

the vehicle was seized as an instrumentality of crime, under section 14-140 of the Administrative Code of the City of New York. That provision calls for sale of such seized property at public auction, following appropriate notice.*

At the time of seizure, the vehicle, a 1988 Mercury Topaz, was worth $6,850. Ford commenced a replevin action to satisfy its perfected security interest in the property, which amounted to $17,719.95. Molomo waived all claims to the vehicle, and the replevin and forfeiture proceedings were consolidated, by consent.

The IAS court held that forfeiture of such leased property, albeit for the salutary public purpose of discouraging narcotics trafficking, was unjustified and unduly oppressive where Ford, the lienholder, was entirely innocent and had done all that could be expected to prevent illegal use of the property, citing dictum in *Calero-Toledo v Pearson Yacht Leasing Co.* (416 US 663). In that case, upholding the Puerto Rico forfeiture statute, the court held that statutory forfeiture schemes which further punitive and deterrent purposes would not be rendered unconstitutional simply because of their applicability to the property interests of innocents. In so holding, Justice Brennan, in an obvious response to his dissenting colleagues, held out the possibility that the "broad sweep" of such forfeiture statutes might very well, in certain circumstances, give rise to "serious constitutional questions" (416 US, *supra,* at 688, 689). For example, "it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent * * * Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for, in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive." (416 US, *supra,* at 689-690.)

---

* We note that this provision of the Code (formerly section 435-4.0) was held unconstitutional as applied, in *McClendon v Rosetti* (460 F2d 111), and even though the constitutional infirmity was "temporarily" repaired with the issuance of guidelines on remand (369 F Supp 1391; *see, Butler v Castro,* 896 F2d 698, 700-702), there has been no corrective amendment to the text in the 18 years since that order. We are not alone in having urged remedial legislative action, thus far to no avail *(Property Clerk, N. Y. City Police Dept. v Seroda,* 131 AD2d 289, 295; *Property Clerk, N. Y. City Police Dept. v Hyne,* 147 Misc 2d 774, 777, *affd* 171 AD2d 506).

The three-pronged formula of the *Calero-Toledo* dictum has been amply satisfied by Ford, which was wholly uninvolved in Molomo's criminal activity, and entirely unaware of such wrongful use of the vehicle. *(See, Property Clerk, N. Y. City Police Dept. v Pagano,* 170 AD2d 30, wherein we upheld the owner's claim to an automobile as superior against forfeiture based upon the crime of reckless operation of the vehicle by his son, even though the son had already established an "abominable" record of traffic violations quite possibly known to the parent.) Here, there is no evidence that Ford was aware of any wrongful use of the vehicle.

The third requirement of the *Calero-Toledo* dictum is that the property owner must do all that reasonably could be expected of him to prevent the proscribed use of his property. Ford met this burden *(see, Property Clerk, N. Y. City Police Dept. v Scricca,* 140 Misc 2d 433) by including in the lease a clause providing that illegal use of the vehicle would constitute a breach of the contract. To require any further efforts on the part of the lessor would exceed the bounds of reasonableness and repudiate the *Calero-Toledo* formula. Such a diluted reading of the forfeiture provision would illogically impute to the Legislature an intention to destroy the contractual rights of third parties innocent of any knowledge of illegal enterprises involving their property *(see, Matter of Dillon v Reese,* 93 Misc 2d 464, 465-466).

It is Ford's adherence to this formula, and not its preferred lienholder status *(see, Santora Equip. Corp. v City of New York,* 138 Misc 2d 631), which warrants return of the property. Unlike our recent decision in *City of New York v Salamon* (161 AD2d 470), Ford has never received satisfaction on its lien. The fair market value of the subject vehicle is but half the amount of the lien. Ford is thus in danger of suffering significant damage by being deprived of the continued leasehold use of this vehicle, which might enable it to mitigate its loss far more than would the proceeds to be realized at auction. Furthermore, in *Salamon* we were primarily concerned with the question of whether the lienholder had suffered any injury "as a result of the city's failure to provide notice" (161 AD2d, *supra,* at 471), whereas notice is not a real issue in this case.

Accordingly, I would affirm the judgment insofar as it awarded possession of the seized vehicle to Ford.

MILONAS, J. P., and SMITH, J., concur with KUPFERMAN, J.; WALLACH and ROSS, JJ., dissent in an opinion by WALLACH, J.

Judgment, Supreme Court, New York County, entered August 13, 1990, modified to the extent of vacating the second and third decretal paragraphs which directed that the motor vehicle forfeited be delivered to Ford or, failing such delivery, the Property Clerk pay Ford $6,850 plus interest from the date of seizure and disbursements and enjoined Ford from delivering the vehicle to defendant or allowing him to redeem it or reinstate his contract with it, and, as so modified, otherwise affirmed, without costs.