664 So.2d 194 (1995)
PARCEL REAL PROPERTY Including all Improvements Thereon and all Contents Therein, Lots Two (2) and Three (3), Block Eleven (11) of the Northwest Survey, Which is LOCATED AT 335 WEST ASH STREET, JACKSON, MISSISSIPPI, Hinds County, and Lillie Boyd
v.
CITY OF JACKSON, Mississippi, a Municipal Corporation.
No. 92-CA-00640-SCT.
Supreme Court of Mississippi.
October 12, 1995.
Rehearing Denied November 22, 1995.
*195 Thomas J. Lowe, Jr., Ross R. Barnett, Jr., Barnett Law Firm, Lillie Boyd, Pro Se, Jackson, for Appellants.
Michele M. Purvis, Jackson, for Appellee.
Before HAWKINS, C.J., and JAMES L. ROBERTS, Jr., and SMITH, JJ.
SMITH, Justice, for the Court:
Lillie Boyd appeals to this Court from an adverse ruling by the Circuit Court of the First Judicial District of Hinds County on a Petition for Forfeiture filed against Boyd and her property by the City of Jackson. Numerous drug-related arrests for cocaine trafficking had been made at Boyd's property located at 335 West Ash Street. Members of Boyd's family were arrested in Boyd's presence for possession of crack cocaine and assorted drug paraphernalia on these various occasions. On September 25, 1991, pursuant to a lawful search warrant, large amounts of crack cocaine, cash, and drug paraphernalia were seized from Boyd's home and a trailer adjacent thereto on the same property. In filing its Petition for Forfeiture against 335 West Ash, the City believed that Boyd's home and adjacent premises were being used to facilitate the sale of illegal drugs and that Boyd had knowledge of such transactions. The trial court granted the forfeiture.
Aggrieved, Boyd appeals to this Court citing three issues for consideration. Boyd wholly failed to cite any authority for two of her issues. This Court has held that "failure to cite any authority in support of ... assignments of error precludes this Court from considering these issues on appeal." Grey v. Grey, 638 So.2d 488, 491 (Miss. 1994), citing Matter of Estate of Mason v. Fort, 616 So.2d 322, 327 (Miss. 1993). Accordingly, this Court refuses to address these issues.
Boyd's third issue concerning whether she had knowledge that her residence was being used to facilitate the sale of illegal drugs warrants discussion. Every case before this Court thus far has dealt with cash or automobile forfeiture, thus the issue before us on real property is one of first impression. The law requires that in order for such property to be forfeited, its owner must either have knowledge of the illegal drug activity or have given consent to his property being used for such illegal conduct. This Court, in most cases of marginal evidence, has usually held that the property should not be forfeited because the evidence in those cases was as consistent with guilt as with innocence.
However, the evidence in the case sub judice more than sufficiently meets the required burden of proof of a preponderance of the evidence against Boyd. Having thoroughly reviewed the record and the briefs, we conclude that there was a preponderance of evidence that Boyd had knowledge and had condoned the use of her property to facilitate illegal drug transactions. Thus, we affirm Judge James E. Graves' forfeiture of Boyd's real property to the City of Jackson.

STATEMENT OF THE FACTS
On September 25, 1991, Officers of Jackson Police Department (JPD) executed a search warrant for 335 West Ash Street, Jackson, Mississippi, the home of Lillie Boyd. Prior to this date, police officers had made numerous drug-related arrests at this address.[1] Upon JPD's arrival on September *196 25, 1991, Boyd was standing in the front doorway. Upon entering the physical property, cocaine was found, in plain view, on a whatnot stand directly behind the front door where Boyd was standing. Assorted drug paraphernalia was recovered from the hallway of the residence and in the trailer out back, which was also covered under the search warrant. Boyd's purse contained $8,000 when it was seized. Bank records revealed a savings account of $22,000, and C.D.s totaling $50,000. Both accounts were seized by the Federal Drug Enforcement Agency for forfeiture proceedings, and thus are not a subject of this forfeiture proceeding. Boyd, her daughter, and her daughter's live-in boyfriend, Frank Lee Jordan, were arrested on cocaine possession charges.
Following the arrest, Boyd's various and sundry personal possessions, along with the realty of 335 West Ash Street, were seized for forfeiture. The City filed its Petition for Forfeiture in the Circuit Court of the First Judicial District in Hinds County on October 15, 1991. Boyd filed her Answer and Counter-Complaint on October 24, 1991. Magnolia Federal Bank, the mortgage holder of 335 West Ash, filed a separate answer denying consenting to or having any knowledge of the subject property being used for drug trafficking.
On March 26, 1991, a hearing on the forfeiture matter was held, and the circuit court judge ordered that the property be forfeited to the City because the evidence revealed that Boyd had knowledge that her home was being used to facilitate the selling of narcotics. The Order also allowed Magnolia Federal Bank's lien to be satisfied first upon the sale of the forfeited property. Boyd filed a Motion for a New Trial, which was overruled. An appeal has now been perfected to this Court.

DISCUSSION OF THE LAW

WHETHER BOYD HAD KNOWLEDGE THAT HER RESIDENCE WAS BEING USED TO FACILITATE THE SALE OF ILLEGAL DRUGS IN VIOLATION OF THE UNIFORM CONTROLLED SUBSTANCE LAW.
We commence our analysis of this issue with an examination of the appropriate statute. Miss. Code Ann. § 41-29-153 (Supp. 1995) states, in part, that the following property shall be subject to forfeiture:
(a)(7) Everything of value, including real estate, furnished or intended to be furnished, in exchange for a controlled substance in violation of this article, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, business or business investments, securities, and other things of value used, or intended to be used, to facilitate any violation of this article.
.....
(A) No property shall be forfeited under the provisions of paragraph (a)(7) of this section, to the extent of the interest of an owner, by reason of any act or omission established by him to have *197 been committed or omitted without his knowledge or consent.
Additionally, we must examine Miss. Code Ann. § 41-29-179 (Supp. 1995) for further analysis of this issue. That section states the burden of proof in a civil forfeiture case as follows:
(2) The standard of proof placed upon the petitioner in regard to property forfeited under the provisions of this article shall be by a preponderance of the evidence.
Continuing our analysis, we next examine our case law. In terms of case law, the facts presented sub judice are of first impression for this Court since the forfeited property is realty. Thus far, we have mostly confronted cash forfeiture or forfeiture questions dealing with automobiles which were used in a narcotics transaction because said vehicle was trustingly lent to a questionable family member. In Ervin v. State, 434 So.2d 1324, 1325 (Miss. 1983), we held that forfeiture will be denied only when the automobile was illegally used without the owner's knowledge or consent. In Ervin, the fact that (1) the vehicle was frequently operated by Mr. Ervin with the knowledge and consent of Mrs. Ervin, (2) that Mr. Ervin had easy accessibility to the car, and (3) that Mrs. Ervin had knowledge of her husband's eight year-old conviction, was not enough to constitute knowledge or consent to justify forfeiture of Mrs. Ervin's car.
Thus, Boyd argues that the fact that her children had easy accessibility to her home, frequently resided there, and had sometimes gotten into trouble with the law, is not enough to constitute knowledge or consent to the drug transactions and usage taking place on her premises. Boyd frames her defense in terms of "nonconsent," essentially saying, just because these controlled substances were being sold at her home, does not mean she approved of or consented to those events. First, the statute reads "knowledge or consent," not "knowledge and consent." Thus, it is important to note that knowledge of illegal activities is enough, consent is not required, or vice-versa. Second, the Uniform Controlled Substances Law does not contain a loophole that would allow the owner of a crack house to blindly permit her hovel to be used for narcotics transactions and later claim that such property should be exempt from forfeiture because she never gave her tenants explicit approval or consent to engage in such illegal conduct.[2]
The Ervin Court concluded that "the owner's knowledge of a spouse's eight-year old conviction fails to establish by a preponderance of the evidence that the owner had knowledge of or consented to the recent unlawful use of the owner's automobile." 434 So.2d at 1326. "Such facts [we]re as consistent with innocence as they [we]re with guilt." Id. "Facts which merely create a suspicion that the owner had knowledge of the driver's illegal activity, are inadequate." Id. In Ervin, Mrs. Ervin, who was the proper owner of the vehicle lent to her husband, "stated that she had never seen marijuana or other illegal drugs in her home or in the presence of her husband." Id.
As applied here, this Court will view the facts of the present case to see if they are as consistent with innocence as they are with guilt, i.e. do the facts merely create a suspicion that Boyd had knowledge of the illegal activities taking place at her residence. Clearly, both of these questions must be answered in the negative.
Whereas, Mrs. Ervin had never seen marijuana or other illegal drugs in her home, Boyd must have been aware of the illegal activities taking place on her property. She often observed police at the subject location arresting her children, other relatives, or other persons due to drug-related activities. On several occasions, officers seized drugs and related paraphernalia from her home and/or the adjacent trailer, in her presence. Furthermore, in light of the last drug bust where Boyd was arrested along with other members of her family, she had to have been aware of the crack cocaine in her home, because the officers, upon entering her home, *198 found the substance in plain view on the whatnot stand right behind her. Moreover, it is "highly" suspect, not "merely" suspect, that Boyd, at the time of her drug-related arrest, would happen to have $8,000 in her purse. Boyd's home was littered with the telltale signs of a drug dealer's depot, of which she cannot now disclaim to have no knowledge. The facts here are clearly more consistent with guilt, as opposed to innocence.
In this Court's most recent forfeiture decision, Curtis v. State, 642 So.2d 381 (Miss. 1994), we adhered to Ervin and held that where the owner frequently allowed her brother to use the vehicle and had warned him against using the car for drug activities, such facts could not be relied on in support of an order for forfeiture. The fact that the owner had known that her brother was arrested (but not yet convicted) for possession of a controlled substance just six weeks prior to the arrest leading to forfeiture, standing alone, did not meet the state's burden of proving that the owner had knowledge of or consented to unlawful use of the vehicle. We observed that:
the fact that Curtis had warned her brother against using her car for drug activities could point in either direction. These facts are as consistent with Curtis' innocence as they are with guilt... . Warning her brother not to carry out his illegal business in her vehicle was not much, but certainly should not be held against Curtis.
Id. at 385. Unfortunately for Boyd, the facts sub judice point in one direction  guilt through knowledge and acquiescence. While we applaud Ms. Boyd's good parental advice in requesting her children to find a new hobby besides the narcotics business, we do not believe this is sufficient to don her with innocent owner status when considering all of the other evidence present in this case.
There is a difference between the scenario where a property owner allows his property to be borrowed by someone he misjudged and then discovers that such property was used for an illegal activity and the situation where a property owner allows his property to "aid and comfort" his in-house drug dealers. In both Ervin and Curtis, the respective owners of the forfeited property knew of only one prior questionable event that could constitute knowledge. Here, there are numerous arrests that Boyd witnessed on her grounds. She twice saw her own daughter being arrested in the adjacent trailer because of the drugs and assorted paraphernalia found there. On other occasions, illegal substances and their required paraphernalia were often found in the main part of her home. People, including her own son who were about to be arrested for possession of drugs, ran to her home seeking shelter and hiding. Surely, Boyd had a clue.
Even if this Court were to pretend that Boyd did not realize her property was a marketplace for drugs, the last arrest, in the ongoing saga of arrests, attests to Boyd's knowledge of the illegal activities on her property and consent to their continuation. In just considering the present arrest leading to the forfeiture, Boyd had to have knowledge of the activities occurring at her abode. The crack cocaine was found in plain view, the drug paraphernalia was dispersed throughout the house, and large amounts of loose cash were located in her purse. She knew what was happening at her residence, and she condoned this illegal pattern of activity by allowing it to continue.
Boyd's attorneys have raised the issue of what constitutes reasonable conduct to prevent one's property from facilitating illegal transactions. Boyd has asked this Court to answer what constitutes a reasonable response of a property owner once knowledge that the property is facilitating drug transactions is acquired by that property owner.
In order to answer this weighty question, we adhere to our longstanding principle that forfeiture statutes must be strictly construed, since they are penal in nature. Saik v. State, 473 So.2d 188 (Miss. 1985). A concern of this Court has been that forfeiture statutes had the capacity "not only [of reaching] the property of criminals, but also ... that of innocent owners who did all they reasonably could to prevent the misuse of their property." Curtis, 642 So.2d at 385. In this case, we cannot see how acquiescence to and knowledge of drug transactions occurring under *199 one's roof constitutes "reasonable" conduct preventing the misuse of property.
The general rule as to what constitutes "reasonable conduct" comes from Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452, reh'g denied, 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974):
[I]t would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent... . Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property. ...
Id., 416 U.S. at 689, 94 S.Ct. at 2094-95 (emphasis added). Other courts have followed the Pearson Yacht standard that an innocent owner do "all that reasonably could be expected" to preclude the illegal use of the property. United States v. 141st Street Corp., 911 F.2d 870 (2d Cir.1990), cert. denied, 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991); See also, United States v. Premises Described as Route 2, Box 61-C, 727 F. Supp. 1295, 1299 (W.D.Ark. 1990) (to prevail on an innocent owner defense, claimant must establish that she was not involved in any wrongful activity, that she was not aware of wrongful activity, and that she had done all that reasonably could be expected to prevent the proscribed use of the property).
In 141st Street Corp., the Second Circuit found that an innocent owner defense could not be established where the property owner (the corporation) failed to take affirmative steps to curb the drug activity after the police had raided the property. Id., 911 F.2d at 879. The only action the corporation took was to instruct the building superintendent not to accept rent from the arrested tenants. The police raided the building a second time, and again, found more narcotics, money, and contraband. The police had thrice contacted the building superintendent about the drug infestation of the building, and had repeatedly tried by phone and letter to contact the corporate owner of the premises. The corporate owner denied receiving any communications from local law enforcement regarding problems at the building and sought to distance himself from the knowledge of his agent, the superintendent. Id. at 876. The Second Circuit rejected this defense and allowed the superintendent's knowledge to be imputed to the corporate owner, especially since the corporation's own president made numerous visits to this "veritable anthill of drug activity." Id. at 876-77. Relying on Pearson Yacht, the 141st Street Corp. court found that the property owner had not done "all that reasonably could be expected." Id., 911 F.2d at 879.
Unfortunately, this "all reasonable" steps rule can backfire so that a private property owner essentially becomes the long arm of the state. See United States v. 710 Main Street, 753 F. Supp. 121 (S.D.N.Y. 1990) (there is a potential for the government to argue that the property owner didn't take all reasonable steps to prevent property from being used to enhance illegal conduct). In 710 Main Street, the owner of a bar and arcade frequented by the members of the drug community was confronted with a challenge of whether his responding conduct was reasonable. The owner had fired employees who engaged in drug transactions, he warned or ejected patrons who were engaging in unlawful activity, he installed cameras, he instituted a "one person, at a time, for one minute, in the restroom" policy, he shut down the rear portions of his restaurant, and he called the police with anonymous phone tips. 753 F. Supp. at 124. The government argued that since the property owner failed to hire a bouncer or doorman to screen his patrons, discontinued the use of an electromagnetic buzzer lock on the front door, and unwisely chose not to turn the premises into another type of business less conducive to heavy pedestrian traffic, the district court should find that the property owner did not meet "all reasonable" steps. Id. at 125. The district court sided with the property owner and held that his response was adequate once he learned of the narcotics problem. The property owner:
was trying to eke out an income from a business located in a drug-infested area *200 that posed great risks to the safety of him and his family, we find that the actions he took, reflective of his fears, concerns and limited familiarity with crime prevention, fulfilled his legal obligation. The fact that he was unsuccessful in resolving the drug problem (as were the well-trained police who patrolled the area) should not be interpreted as his consent to that activity.
Id. at 125.
In the case sub judice, Lillie Boyd did not do anything to prevent the misuse of her property. In this case, the Court cannot even consider whether "all reasonable" steps were taken, or whether substantial steps were taken, since there were no steps taken to prevent her property from being used to facilitate drug transactions. This Court is not presented with an opportunity to determine whether Boyd's conduct was adequate, since she willfully blinded herself to her criminal surroundings and took no action. We cannot see how acquiescence to and knowledge of drug transactions occurring under one's roof constitutes "reasonable" conduct preventing the misuse of property. This Court will follow the United States Supreme Court in requiring that property owners do "all that is reasonably expected to prevent the proscribed use of the property," with an emphasis more on the term "reasonable" than on the term "all." In accord with 710 Main Street, a property owner "need not take heroic or vigilante measures to rid his property of narcotics activity." 753 F. Supp. at 121.
This Court has no intention of turning private individuals into agents of the state. However, reasonable affirmative conduct is required lest property owners hinder the ongoing war on drugs by becoming beneficiaries of the vilest portions of our society with a mere wink and a nod. The last thing that this Court intends is to allow the confiscation of private homes of innocent people whose sole conduct is merely unknowingly allowing their property to be used by others in illegal drug activity, especially if these property owners are restrained in some way from objecting to and preventing such activity. Yet, as a general rule, we still require all reasonable affirmative conduct to prevent a person's property from being used to facilitate illegal drug transactions. Boyd totally failed this simple test.
The lower court did not err in holding that Boyd had knowledge of and consented to her property being used to violate the Uniform Controlled Substances Law. We affirm the judgment of the lower court in favor of the City of Jackson.
JUDGMENT AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
McRAE, J., concurs in result only.
NOTES
[1] Usually, it was a Boyd family member who was involved in these arrests. Even though Boyd, herself, had never been arrested at one of the prior raids, she was present on most occasions when the arrests were made and she was advised as to the reasons for the said arrests. These are a few examples of such arrests:

On August 5, 1991, Mary Lucinda Moore, Boyd's daughter was arrested on possession of cocaine. The arrest occurred in the trailer adjacent to the house, and Boyd was present at the time of the arrest.
On July 6, 1991, an officer, while working undercover, agreed to purchase cocaine from an individual who approached his vehicle. Then this individual ran into 335 West Ash and a woman inside gave him what appeared to be crack cocaine. The individual returned to the officer's vehicle and took $20 in exchange for the cocaine. Within minutes of this transaction, officers were dispatched to 335 West Ash, where the surveillance officer identified Gloria Harper as the individual who had sold the cocaine at the vehicle. At the time of Harper's arrest, she and Boyd had been conversing on the living room sofa. Along with Harper, J.W. Boyd and Johnny Ray Wilson were also arrested for possession of paraphernalia, in the presence of Boyd.
On April 19, 1990, J.W. Boyd, Boyd's son, ran into 335 West Ash Street, after being observed in what appeared to be a crack cocaine sale. Boyd was present when the officers pursued her son and arrested him inside her home. In fact, Boyd was also present at his trial and conviction, which this Court affirmed. See Boyd v. State, 634 So.2d 113 (Miss. 1994).
On August 12, 1990, Jackie Wells was seen exiting 335 West Ash with a plastic bag in his hand. The bag was believed to contain crack cocaine. Wells saw officers exit their car, and he immediately ran back to 335 West Ash, and relayed the plastic bag to McKinley Owens. The plastic bag was recovered and found to contain eleven (11) rocks of cocaine. Boyd was present in the front room of her house when the officers retrieved the cocaine from Owens and Wells.
On May 25, 1990, another search warrant had been executed to search 335 West Ash. Cocaine, marijuana, food stamps, and $11,000.00 were recovered from the adjacent trailer where Moore resided. On this occasion, Boyd was again present when her daughter was being arrested. Some of the bills found in Boyd's home during that raid were analyzed by washing, and 20 of the bills showed the presence of cocaine.
[2] Willful blindness will remove an innocent owner defense. United States v. 5745 N.W. 110 Street, 721 F. Supp. 287, 290 (S.D.Fla. 1989) (property owner "deliberately closed her eyes to what she had every reason to believe was the truth").